# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Norman Propst**, on behalf of himself and all others similarly situated,

*Plaintiff*,

    v.

**Brookfield Properties Multifamily, LLC**,

*Defendant*.

Civil Action No.: 1:25-cv-00636-JMC

---

**DEFENDANT BROOKFIELD PROPERTIES MULTIFAMILY, LLC'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
ITS MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................... 1

BACKGROUND FACTS ........................................................................................................ 3

    I.     Plaintiff Signs a Lease for an Apartment at Guild That Discloses His Rent
           and All of the Complained-of Fees ........................................................................ 3

    II.    Plaintiff's Complaint ............................................................................................ 5

STANDARD OF REVIEW ...................................................................................................... 6

ARGUMENT ......................................................................................................................... 7

    I.     Plaintiff Lacks Standing to Bring His Holding Deposit Claim Because He
           Did Not Suffer an Injury in Fact .......................................................................... 7

    II.    The Complaint Fails to State a Claim Under the CPPA ........................................ 9

         A.    The Holding Deposit Claim Fails Under the CPPA ................................. 10

         B.    The Electricity/Trash Claims Fail Under the CPPA ................................. 12

         C.    The Service Fees Claim Fails Under the CPPA ........................................ 14

         D.    The Drip Pricing Claim Fails Under the CPPA ........................................ 17

         E.    The Catch-All Allegations Fail Under the CPPA ..................................... 20

               i.     Plaintiff Fails to Allege a Deceptive and/or Unfair Trade
                     Practice Prohibited by Section 3904 ............................................... 20

               ii.    Plaintiff Fails to Allege a Violation of Section 3904(f) or
                     (f-1) ................................................................................................ 21

               iii.   Plaintiff Fails to Allege a Violation of Section 3904(r) ................ 22

CONCLUSION ...................................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*333 8th St., NE, LLC v. Turnkey Title, LLC*,
  No. CV 23-941 (JEB), 2024 WL 5168219 (D.D.C. Dec. 19, 2024)........................................7

*Alicke v. MCI Commc'ns Corp.*,
  111 F.3d 909 (D.C. Cir. 1997) ...............................................................................................9

*DeSilva v. Donovan*,
  81 F. Supp. 3d 20 (D.D.C. 2015) ............................................................................................6

*Florio v. Gallaudet Univ.*,
  119 F.4th 67 (D.C. Cir. 2024)..........................................................................................7, 21

*Floyd v. Bank of Am. Corp.*,
  70 A.3d 246 (D.C. 2013) ..................................................................................................9, 21

*Grayson v. AT&T Corp.*,
  15 A.3d 219 (D.C. 2011) .....................................................................................8, 19, 21, 22

*Hirlinger v. WP Co. LLC*,
  No. 23-CV-05963-AMO, 2024 WL 2941630 (N.D. Cal. June 10, 2024)
  ............................................................................................................9, 12, 15, 17, 20

*Little v. SunTrust Bank*,
  204 A.3d 1272 (D.C. 2019) ....................................................................................................7

*Mann v. Bahi*,
  251 F. Supp. 3d 112 (D.D.C. 2017).....................................................................................8, 13

*Martin v. U.S. Marshals Serv.*,
  674 F. Supp. 2d 122 (D.D.C. 2009) ........................................................................................7

*Nanan v. Hines*,
  No. 2024 LTB 850, 2024 WL 4697067 (D.C. Super Ct. Nov. 06, 2024)..........................18, 19

*Pearson v. Chung*,
  961 A.2d 1067 (D.C. 2008) ..............................................................................................9, 20

*Salvador v. Allstate Prop. & Cas. Ins. Co.*,
  No. CV 19-2754 (RJL), 2020 WL 7042843 (D.D.C. Nov. 30, 2020) ....................................21

*Uhar & Co., Inc. v. Jacob*,
  710 F. Supp. 2d 45 (D.D.C. 2010) ..........................................................................................3

*Ward v. D.C. Dep't of Youth Rehab. Servs.*,
  768 F. Supp. 2d 117 (D.D.C. 2011) ........................................................................................3

*Whiting v. AARP*,
  701 F. Supp. 2d 21 (D.D.C. 2010) *aff'd,* 637 F.3d 355 (D.C. Cir. 2011)
  ..................................................................................................9, 12, 15, 17, 20

*Williams v. Donovan*,
  219 F. Supp. 3d 167 (D.D.C. 2016) ..............................................................7

**Statutes**

15 U.S.C. § 45 ...................................................................................................21

Consumer Protection Procedures Act,
  D.C. Code §§ 28-3901 *et seq.* ................................................ *passim*

D.C. Code § 34-922 ..........................................................................................13

D.C. Code § 34-2413 ........................................................................................13

D.C. Code § 38-701 ..........................................................................................13

D.C. Code § 42-3501 ............................................................10, 11, 18, 19,

D.C. Code § 42-3505 ....................................................................15, 16, 17

D.C. Mun. Regs. tit. 14, § 600 *et seq* .........................................13, 14

**Rules**

Fed. R. Civ. P. 12.........................................................................1, 6, 7, 8, 10

Defendant Brookfield Properties Multifamily, LLC ("Brookfield") respectfully moves to dismiss the class action complaint, dated December 11, 2024 (the "Complaint"), filed by Plaintiff Norman Propst ("Plaintiff"), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## <u>INTRODUCTION</u>

Brookfield manages apartment buildings in Washington, D.C., including the "Guild," where Plaintiff has resided since July 2024. Plaintiff alleges, on behalf of himself and a putative class of Brookfield tenants at the Guild and other properties, that certain deposits and fees—including, for example, requiring tenants to pay for the electricity, water, sewer, and trash services they use while residing at Brookfield's properties—are deceptive and violate D.C.'s Consumer Protection Procedures Act ("CPPA").

However, Plaintiff cannot plausibly allege that he was misled because Brookfield expressly told its tenants, including Plaintiff, exactly what they were paying for and exactly what they were receiving in return. Accordingly, as set forth in more detail below, Plaintiff's CPPA claim—which consists of independent sub-claims based on the type of fees challenged—should be dismissed.

*First*, Plaintiff complains that he paid a $250 "Holding Deposit" when he applied for an apartment at Guild. D.C. law expressly permits landlords to charge a Holding Deposit, and to convert that deposit to part of a tenant's security deposit. That is precisely what happened here: Plaintiff paid a $250 Holding Deposit to Brookfield, which became part of his security deposit. Plaintiff does not allege otherwise, but instead complains that the Holding Deposit was charged at the wrong time, because it was paid when he applied instead of when his application was approved. However, in addition to failing to allege that he was somehow deceived with respect to the Holding Deposit, he does not and cannot plead that he suffered any injury as a result of paying it. Plaintiff's CPPA claim based on payment of a Holding Deposit thus fails for lack of standing.

*Second*, Plaintiff cannot state a claim under the CPPA for any of the challenged fees or expenses because he cannot allege he was deceived in any manner. ***In fact, each of the fees about which Plaintiff complains were specifically and expressly disclosed in the Lease Agreement he signed.*** For example, Plaintiff complains he was charged common area trash and electricity fees, but he specifically agreed in the Lease that he would pay a trash fee and that he "may be paying for part of the utility usage in common areas," which he agreed is "fair and reasonable." Plaintiff similarly alleges that service fees paid to third-parties Conservice and Metergy were somehow misleading, even though he specifically agreed in his Lease that "Conservice will charge . . . [a] rent service fee" and that he would "pay Metergy [] directly . . . a monthly administration fee."

*Third*, and all that is left of Plaintiff's claims, Plaintiff attempts to manufacture deception by interpreting and applying arcane provisions of the D.C. Housing Code and Regulations in a manner that is plainly contradictory to their terms and intent. Plaintiff argues that because landlords in the District of Columbia must "furnish" certain services (water, electricity, gas, etc.) to tenants, that means they must "furnish them without charge," even though the D.C. Council has specifically declined to adopt such a rule to date. Plaintiff argues that because a landlord must maintain a unit in a condition consistent with the implied warranty of habitability, that somehow means they must pay for tenants' utilities. Additionally, Plaintiff argues that utility bills qualify as "rent" as a matter of D.C. law that must be baked into rent prices when advertising. None of these theories can be squared with the provisions upon which they are based, and therefore they cannot serve as a predicate for Plaintiff's CPPA claims.

For all these reasons and those stated more fully herein, Brookfield respectfully requests that the Court dismiss the Complaint with prejudice.

## BACKGROUND FACTS

Unless otherwise noted, all facts are taken from Plaintiff's Complaint or from documents upon which the Complaint necessarily relies, such as the Lease.[1]

### I.    Plaintiff Signs a Lease for an Apartment at Guild That Discloses His Rent and All of the Complained-of Fees

According to the Complaint, Plaintiff applied for an apartment at Guild on April 5, 2024, and signed his Lease on June 17, 2024.  Compl., ¶¶ 6–8.  He moved in two weeks later on July 1, 2024, and is still a resident of Guild.  *Id.* at ¶ 9.

At the outset, the Lease defines Plaintiff's "Monthly Rent" for his apartment at Guild as "$2,673.00."  Ex. A, Lease, p. 1.  The Lease further states that Plaintiff agrees to rent his apartment at Guild "on the terms and conditions set forth herein."  *See id.* at p. 3.

Section 5 of the Lease, entitled "Utilities and Services," further provides that Plaintiff:

- **"agrees to pay for all utilities and services, related deposits, and any charges or fees** when they are due and as outlined in this Lease";

- **"will pay separately for gas, water, sewer, stormwater/drainage, electricity, trash/recycling, pest control, utility billing fees and other items as outlined in separate addenda**, Special Provisions or an amendment to this Lease"; and

- **"agrees to pay all utility charges assessed by utility companies (including** utility deposits, new account fees, **service fees** and late fees) **or third-party billing companies engaged by Landlord** . . . ."

Ex. A, Lease, § 5 (emphasis added).

---

[1]    A true and correct copy of the Lease is attached as Exhibit A.  This Court may properly consider the Lease on Brookfield's motion.  *See, e.g., Uhar & Co., Inc. v. Jacob*, 710 F. Supp. 2d 45, 49 n. 5 (D.D.C. 2010) ("Although the plaintiff did not attach the lease as an exhibit to the complaint, it does reference the lease in its complaint.  Therefore, the court may consider the lease in resolving this motion [to dismiss].");  *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (noting the court may consider "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss") (internal citations omitted).

As referenced in Section 5, the Lease also contains a Utility Addendum for Water, Sewer, Gas, Trash, and Electric Service (the "Utility Addendum") that further details Plaintiff's "[r]esponsibility for payment of utilities, and the method of metering or otherwise measuring the cost of the utility." Ex. A, Utility Addendum, § 1.[2]  For each utility, the Utility Addendum states as follows:

- **Water and Sewer:**  Water and sewer service will be paid "by Resident [Plaintiff]" using third-party billing company Metergy Solutions ("Metergy").  *Id.* at § 1(a). The Utility Addendum further provides that:  (1) "[p]ayment for your water and sewer usage is **not included in your rent** and will be billed separately by Metergy"; and (2) Plaintiff "agree[s] to pay Metergy [] directly for your utility usage **as well as the fees and/or charges of Metergy** [] for its services, **including . . . a monthly administration fee of $7.45.**"  *Id.* at § 11 (emphasis added).

- **Trash:**  Trash service will be paid "by Resident when trash bills are billed" by third-party billing company Conserve and "Conserve will charge $4.00 per bill mailed rent service fee."  *Id.* at §§ 1(d), 11.

- **Electricity:**  Electric service will be paid "by Resident directly to the utility service provider."  *Id.* at § 1(e).  The Utility Addendum further provides that "**Common Area Electric service to your dwelling will be paid by you** when electric bills are billed by the service provider to us and then allocated to you based on a ratio square footage formula."  *Id.* at § 11 (emphasis added).

Finally, Section 2 of the Utility Addendum notes that:

> If an allocation method is used [to determine a Resident's share of any utilities], Landlord or its billing company **will calculate Resident's allocated share of the utilities and services provided and all costs.**  Under any allocation method, **Resident may be paying for part of the utility usage in common areas** . . . . **Both Resident and Landlord agree that using a calculation or allocation formula** as a basis for estimating total utility consumption **is fair and reasonable**, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident.

*Id.* at § 2 (emphasis added).

---

[2]     The Utility Addendum further provides that it "shall control" if it "var[ies] or contradict[s] any terms or conditions found in the Lease."  *See* Ex. A, Utility Addendum, p. 1.

## II.     Plaintiff's Complaint

Despite these clear and unambiguous disclosures in his Lease and accompanying Utility Addendum (and, as set forth below, the clear and unambiguous provisions of D.C. law), Plaintiff alleges that he and other members of the putative classes paid for holding deposits, utilities, and other fees in violation of D.C. law, and thus the CPPA.[3]  Broadly speaking, Plaintiff's allegations fall into four main categories:

*First*, Plaintiff alleges he was required "to pay a $50 'Application Fee' and an additional $250 'Holding Deposit'" when he submitted his rental application to live at Guild.  Compl., ¶ 10.  Plaintiff admits that holding deposits are permitted under D.C. law (*id.* at ¶ 12), and nowhere alleges that Brookfield failed to "hold" his apartment, or that the $250 Holding Deposit was not applied to his security deposit, or that he suffered any harm by paying the $250 Holding Deposit.  *See id.* at ¶¶ 10-17.  Instead, conflating together these two distinct payments under D.C. law—the $50 application fee and a $250 Holding Deposit—Plaintiff alleges that he paid an application fee that exceeded $52, the current maximum amount for an application fee under D.C. Code § 42-3505.10(b)(1).  *Id*. at ¶¶ 11, 15 (the "Holding Deposit Claim").

*Second*, Plaintiff alleges that paying for a share of Guild's trash fees, and for electricity in both his own apartment and in Guild's common areas, violates the D.C. Housing Code because, in Plaintiff's view, he "has no ability to control" these services and the Housing Code "requires housing providers to pay for" them.  Compl., ¶¶ 19–24 (the "Electricity/Trash Claims"). [4]

---

[3]     Plaintiff's Complaint is one of several class action complaints filed by his counsel alleging similar claims against landlords in the District of Columbia.

[4]     While Plaintiff brings separate claims related to the common area electricity and trash fees (Compl., ¶¶ 61b.-c.), the allegations related to both claims are combined in the Complaint and are therefore discussed jointly herein.

*Third*, Plaintiff alleges he is required to pay:  (1) a $4.50 Rent Service Fee to pay his rent and other charges through third-party Conservice (the "Conservice Fee"); and (2) a $7.80 Service Charge and a $1.54 Metering Fee to pay his water bills through Metergy (the "Metergy Fees," and together with the Conservice Fee, the "Service Fees").  Compl., ¶¶ 27–28.  As with the Electricity/Trash Claims, Plaintiff's Service Fees claim rests on his theory that Brookfield is barred from charging these Service Fees under the D.C. Code, the D.C. Housing Code, and the implied warranty of habitability.  *Id.* at ¶¶ 30–34 (the "Service Fees Claim").

*Fourth*, Plaintiff alleges that—even though the Lease and Utility Addendum expressly state he must pay the Metergy Fees—Brookfield nevertheless somehow "failed to disclose" those Fees, which, according to Plaintiff, are part of the "rent" for his apartment under the D.C. Code's definition of "rent."  Compl., ¶¶ 37–42.  On this ground, Plaintiff alleges the Metergy Fees constitute an improper drip pricing scheme under the CPPA.  *Id.* at ¶ 39 (the "Drip Pricing Claim").

Taken together, Plaintiff alleges that each of the Holding Deposit, Electricity/Trash, Service Fees, and Drip Pricing Claims violate D.C. law, and thus the CPPA.  Plaintiff thus purports to bring a putative class action on behalf of both all prospective tenants of Brookfield's properties (for the Holding Deposit Claim) and all current and former tenants of Brookfield's properties (for the remaining Claims).  Compl., ¶¶ 48, 60.

## **STANDARD OF REVIEW**

"Standing is a threshold jurisdictional requirement" that must be addressed "in order to proceed to evaluate a case on the merits."  *DeSilva v. Donovan*, 81 F. Supp. 3d 20, 23 (D.D.C. 2015).  "Under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has [standing]."  *Id.*

6

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Florio v. Gallaudet Univ.*, 119 F.4th 67, 73 (D.C. Cir. 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Williams v. Donovan*, 219 F. Supp. 3d 167, 172 (D.D.C. 2016) (quoting *Iqbal*, 556 U.S. at 679). However, a court need not "accept as true . . . a legal conclusion couched as a factual allegation or an inference unsupported by the facts set forth in the complaint." *333 8th St., NE, LLC v. Turnkey Title, LLC*, No. CV 23-941 (JEB), 2024 WL 5168219, at *2 (D.D.C. Dec. 19, 2024) (internal citations omitted). Instead, "more than labels and conclusions" are required. *Martin v. U.S. Marshals Serv.*, 674 F. Supp. 2d 122, 126 (D.D.C. 2009).

## ARGUMENT

As set forth below, the Complaint should be dismissed for two reasons.

*First*, Plaintiff lacks standing to bring his Holding Deposit Claim because he does not and cannot allege that he suffered an injury in fact as a result of paying the Holding Deposit.

*Second*, Plaintiff fails to state a plausible claim for a violation of the CPPA for any of his Holding Deposit, Electricity/Trash, Service Fees, or Drip Pricing Claims. Plaintiff does not point to any undisclosed fees and therefore cannot allege any statements or conduct that was misleading or deceptive. Instead, each claim relies on a tortured and erroneous interpretation of D.C. statutory and regulatory provisions that do not apply to the complained-of conduct.

## I.    Plaintiff Lacks Standing to Bring His Holding Deposit Claim Because He Did Not Suffer an Injury in Fact

A "plaintiff [does not] automatically satisf[y] the injury-in-fact requirement whenever a statute [such as the CPPA] grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Little v. SunTrust Bank*, 204 A.3d 1272, 1274 (D.C. 2019)

(alterations modified) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)).  Rather, "a person who brings a CPPA enforcement action must have suffered or must be in imminent danger of suffering an injury-in-fact." *Grayson v. AT&T Corp.*, 15 A.3d 219, 250 (D.C. 2011); *see also Mann v. Bahi*, 251 F. Supp. 3d 112, 119 (D.D.C. 2017) (noting that, "if the [plaintiff] had only alleged that [the defendant] violated the CPPA without also alleging that he was misled or that he suffered any harm, that would not be sufficient").

Here, the Holding Deposit Claim fails this test because Plaintiff does not allege that he suffered any injury by paying the Holding Deposit.  To be sure, Plaintiff alleges, in conclusory fashion, that he paid "fees related to his rental application far exceeding that permitted" under D.C. law by paying the $250 Holding Deposit.  Compl., ¶ 15.[5]  But Plaintiff elsewhere admits that he received exactly what he paid the Holding Deposit for—an apartment at Guild.  *Id*. at ¶ 9.  As his Lease makes clear, Plaintiff was required to pay a security deposit for his apartment.  Ex. A, Lease, p. 1.  Part of that security deposit was Plaintiff's $250 Holding Deposit, which Brookfield converted to his security deposit, and which Plaintiff admits is entirely consistent with D.C. law.  *See* Compl., ¶ 12; D.C. Code § 42-3501.03(13A) (explaining that "if a tenant accepts a unit[, the holding deposit] becomes part of the prospective tenant's first month's rent or security deposit").

In short, by paying his $250 Holding Deposit here, Plaintiff received exactly what he was entitled to under the Lease and the D.C. Code—an apartment at the Guild and a portion of his security deposit.  Plaintiff does not and cannot allege that he suffered any actual injury from paying the Holding Deposit.  Accordingly, Plaintiff lacks Article III standing to bring a CPPA claim based on that Deposit, and his Holding Deposit Claim should be dismissed.

---

[5]     As discussed *infra*, Plaintiff's Holding Deposit Claim should also be dismissed under Fed. R. Civ. P. 12(b)(6) as it misconstrues applicable law and fails to state a claim.  *Infra*, pp. 10–11.

## II.     The Complaint Fails to State a Claim Under the CPPA

In addition to lacking standing with respect to his Holding Deposit Claim, Plaintiff's Complaint also fails to state a claim for which relief can be granted under the CPPA.  A CPPA claim fails if it is based on statements that are "accurate, not misleading to a reasonable consumer, or mere puffery."  *Whiting v. AARP*, 701 F. Supp. 2d 21, 29 (D.D.C. 2010) *aff'd*, 637 F.3d 355 (D.C. Cir. 2011).  The Court must view the complained-of practice "in context" and not "in isolation," *id.* at 29–30 & n.7 and must consider "how the [complained-of] practice would be viewed and understood by a reasonable consumer." *Pearson v. Chung,* 961 A.2d 1067, 1075 (D.C. 2008).  Accordingly, this Court and others have dismissed CPPA claims as a matter of law that, viewed in context and not in isolation, merely point to statements that are not misleading to a reasonable consumer.  *See, e.g.*, *Floyd v. Bank of Am. Corp.*, 70 A.3d 246, 256–57 (D.C. 2013); *see also Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997) (dismissing CPPA claim because defendant's "billing practices could not mislead a reasonable customer"); *Hirlinger v. WP Co. LLC*, No. 23-CV-05963-AMO, 2024 WL 2941630, at *6 (N.D. Cal. June 10, 2024) (dismissing CPPA claim because defendant's advertisement was "clear[] and unambiguous[]").

### A.    The Holding Deposit Claim Fails Under the CPPA

Plaintiff's Holding Deposit Claim fails under Rule 12(b)(6), as he alleges no misleading conduct but instead seeks to convert an alleged technical timing issue into a CPPA claim. Plaintiff does not allege that he was somehow "misled" as it relates to the Holding Deposit, but instead complains that he was "required to pay a $50 'Application Fee' and an additional $250 'Holding Deposit' before [Brookfield] would evaluate his application," Compl., ¶ 10, which he claims transformed his "holding deposit" into an "application fee" that exceeded the $52 statutory limit for an application fee under the D.C. Code. *Id.* at ¶¶ 11–12 (citing D.C. Code § 42-3505.10(b)(1)). This theory fails because it is premised on a misreading of the D.C. Code.

Specifically, Plaintiff's theory is inconsistent with the D.C. Council's separate and distinct definitions for both an "application fee" and a "holding deposit." Those definitions were enacted as part of the Fairness in Renting Clarification Amendment Act of 2023, one goal of which was "to address a gap in the current law that housing providers have used to charge prospective tenants both application fees and separate processing fees." *See* Ex. B, Committee on Housing Report on B25-0074, p. 3. To that end, the Council defined an "application fee" as:

> the total of all costs or fees that a prospective tenant is required to pay to a housing provider at the time of application or at any time prior to signing a lease as a prerequisite to evaluating or approving a prospective tenant's application for rental housing, including processing, reviewing, or screening the prospective tenant's application, **but not including holding deposits**.

D.C. Code § 42-3501.03(2A) (emphasis added).

And the Council further defined a "holding deposit," in turn, as:

> the amount a housing provider requires a prospective tenant to pay after a housing provider approves a tenant's application, which temporarily makes a unit unavailable to other prospective tenants and which if a tenant accepts a unit becomes part of the prospective tenant's first month's rent or security deposit.

D.C. Code § 42-3501.03(13A).

Thus, by its terms, an application fee is separate from a "holding deposit" under the D.C. Code; indeed, the definition of "application fee" expressly states it does "not includ[e] holding deposits." D.C. Code § 42-3501.03(2A). Plaintiff's Holding Deposit Claim, however, turns this statutory language on its head, expressly treating Plaintiff's Holding Deposit as a separate "application fee" in order to manufacture a violation of the $52 statutory limit on application fees under D.C. law. *See* Compl., ¶¶ 11–12.

Plaintiff attempts to circumvent this distinction by focusing on timing—alleging that Plaintiff submitted his Holding Deposit when he applied for an apartment, rather than when his application was approved. *See* Compl., ¶¶ 10–12. However, this technical timing issue cannot somehow transform his "deposit" into a "fee," as these are separate concepts under the D.C. Code and given the terms' common usage. *See* D.C. Code § 42-3501.03(2A) (providing that "application fee" does "not includ[e] holding deposits"); *see also compare Deposit*, MerriamWebster.com, https://www.merriam-webster.com/dictionary/deposit (last visited Mar. 11, 2025) (defining "deposit" as "something placed for safekeeping such as" "money given as a pledge or down payment"), *with Fee*, MerriamWebster.com, https://www.merriam-webster.com/dictionary/fee (last visited Mar. 11, 2025) (defining "fee" as "a fixed charge" or "a sum paid or charged for a service").

Accordingly, in addition to lacking standing to bring it, Plaintiff's Holding Deposit Claim also fails to state a claim for which relief can be granted under the CPPA.

**B.      The Electricity/Trash Claims Fail Under the CPPA**

Plaintiff's Electricity/Trash Claims—which are premised on his allegation that Brookfield violated the D.C. Housing Code when it charged him for a portion of the common area trash and electricity fees—fail to state a claim for relief because:  (1) there is nothing misleading about charging fees that were prominently disclosed in Plaintiff's Lease; and (2) the claims rest exclusively on an incorrect construction and application of D.C. law.

Plaintiff signed both the Lease and the Utility Addendum, in which he expressly agreed to pay for his own electricity usage *and* for a portion of the common area trash and electricity fees. *See* Ex. A, Utility Addendum, §§ 1.d, 1.e, 2, 11 (specifically disclosing that Plaintiff would pay for his own electricity usage and for "Common Area Electric service," would also be charged a trash fee by Conservice, and that he "may be paying for part of the utility usage in common areas," which he agreed is "fair and reasonable").  Given that he expressly agreed to pay these fees, he cannot reasonably claim to have been "misled" by them under the CPPA.  *See* Compl., ¶¶ 21–22; *see also Whiting*, 701 F. Supp. 2d at 29; *Hirlinger*, 2024 WL 2941630, at *6.

Nor can Plaintiff's Electricity/Trash Claims be squared with the D.C. Housing Code provisions upon which they are predicated.  Specifically, Plaintiff claims that the D.C. Housing Code requires housing providers like Brookfield to provide common area electricity and trash services—among other utilities—to residents free of charge.  Compl., ¶ 23.  Plaintiff's contention is based on a single provision of the D.C. Housing Code, which provides:

> Where a utility (such as water, electricity, gas or other fuels, or sewer or refuse service) is the responsibility of, or under the control of, the owner or licensee of any residential building, the **utility shall be furnished and maintained by the owner or licensee** in the quantities needed for normal occupancy.

Compl., ¶ 23 (quoting D.C. Mun. Regs. tit. 14, § 600.3 (emphasis in Complaint)).

Citing no other support, Plaintiff claims that the D.C.'s Housing Code use of the word "furnish" effectively means "furnish for free" and therefore "requires housing providers to pay for such utilities." *Id*. at ¶ 24. This strained interpretation of the D.C. Housing Code is wrong for at least four reasons.

*First*, Plaintiff's interpretation of the word "furnish" to mean "free" conflicts with common usage. The ordinary definition of "furnish" is simply "to provide with what is needed," and doesn't reference payment or cost at all. *See Furnish*, MerriamWebster.com, https://www.merriam-webster.com/dictionary/furnish (last visited Mar. 11, 2025).

*Second*, Plaintiff's interpretation is belied by other provisions of D.C. law that clearly state when items must be "furnish[ed] without charge." *See, e.g.*, D.C. Code § 38-701 (titled "Textbooks and supplies furnished without charge"); D.C. Code § 34-922 (titled "Certified copy . . . to be furnished without cost"); D.C. Code § 34-2413.11 [Repealed] (titled "Potomac water to be furnished to charitable institutions without charge"). If the D.C. Council wished to require housing providers to pay for utilities, it would have similarly required them to do so "without charge." It did not here. *See Mann*, 251 F. Supp. 3d at 124 ("To interpret two statutes in a manner that would render one nonsensical or superfluous would be inappropriate.").

*Third*, the language and context of D.C. Municipal Regulations, Section 600.3 make clear that provision is intended to require landlords to ensure that tenants have a habitable living environment. D.C. Mun. Regs. tit. 14, § 600.3. Section 600.3 provides that the referenced utilities must be furnished "in the quantities needed for normal occupancy"—which would make no sense if it were intended to require landlords to pay for those services. *Id*. For example, if read in the manner suggested by Plaintiff, landlords could charge tenants for common utilities so long as they were in excess of the normal quantities. Moreover, the other provisions of Chapter 14-6 (including

those surrounding Section 600.3) focus exclusively on habitability concerns—not the apportionment of costs. *See* D.C. Mun. Regs. tit. 14 §§ 600.2 & 600.4 (requiring facilities to be "in a safe and good working condition"); *see also* D.C. Mun. Regs. tit. 14 § 601 (describing basic plumbing facilities, including, for example, requiring units to contain a kitchen sink); D.C. Mun. Regs. tit. 14 § 602 (rules regarding shared bathrooms, including allowable ratio).

*Fourth*, the D.C. Council's recent consideration of proposed amendments to the D.C. Code further underscores that the Housing Code does not mean what Plaintiff says. Section 14-600.3 was adopted in 1955 and has never been amended. *See* Ex. C (Annotated D.C. Mun. Regs. tit. 14 § 600.3). In fact, in the last legislative session, the D.C. Council introduced—***but did not adopt***—a bill to prohibit charging tenants "for the utility charges accrued by the housing accommodation for its common areas." *See* Ex. D (D.C. Council Bill 25-0991). And the same bill has been introduced in the current legislative session. *See* Ex. E (D.C. Council Bill 26-0126). These amendments targeted the precise conduct that Plaintiff claims violates D.C. Mun. Regs. tit. 14 § 600.3 as currently written. The fact that the D.C. Council has thus far declined to adopt the amendments is another indication that Plaintiff's interpretation of existing D.C. law is wrong.

Accordingly, Plaintiff cannot plausibly allege that the trash and common area electricity fees were either misleading or violated D.C. law, and his Electricity/Trash Claims should be dismissed.

### C.    The Service Fees Claim Fails Under the CPPA

Next, Plaintiff alleges that paying the Service Fees violates D.C. law because housing providers are prohibited under the Code "from charging tenants fees for basic services necessary to maintain a unit consistent with the implied warranty of habitability." Compl., ¶ 30. As with his Electricity/Trash Claims, Plaintiff's Service Fees Claim fails under the CPPA because: (1) Plaintiff expressly agreed to pay the Service Fees when he signed the Lease and the Utility

Addendum, *see supra*, pp. 3–4, so there was nothing misleading about those Fees; and (2) the Service Fees are not otherwise actionable under the CPPA because Plaintiff's Claim rests on another misreading of D.C. law.

Again, Plaintiff claims that a fee that he expressly agreed to pay somehow violates the CPPA. Plaintiff did not just generally agree to pay vague or undisclosed fees—he specifically agreed to pay the precise Service Fees about which he now complains. *See* Ex. A, Utility Addendum, § 11 (agreeing to "pay Metergy [] directly . . . a monthly administration fee of $7.45" and that "Conservice will charge $4.00 per bill [] service fee"). Accordingly, he cannot reasonably claim to have been "misled" by the Service Fees. *See* Compl., ¶¶ 21–22; *see also Whiting*, 701 F. Supp. 2d at 29; *Hirlinger*, 2024 WL 2941630, at *6.

Plaintiff is left with his statutory argument, which also fails. Plaintiff's contention that the Service Fees violate D.C. Code is based on Section 42-3505.10(b-2)(1), which provides, in part, that "[a] housing provider shall not charge a fee to a prospective tenant . . . for services required of the housing provider to maintain a unit in a condition consistent with the implied warranty of habitability." D.C. Code § 42-3505.10(b-2)(1). Plaintiff alleges that paying the Service Fees to a third-party like Conservice or Metergy is equivalent to a fee charged by a housing provider to maintain a unit in a habitable condition. Compl., ¶ 34. Again, Plaintiff attempts to fit a square peg in a round hole.

*First*, as a threshold matter, Plaintiff admits that the Conservice Fee permits him "to pay his rent and other utility-related charges billed by Conservice," and that the Metergy Fees permit him "to pay his water bills through [Metergy.]" Compl., ¶¶ 27–28. The Service Fees are thus payments to third-party providers, not to a housing provider (like Brookfield) for its maintenance

15

of a unit.  Accordingly, by its terms, D.C. Code § 42-3505.10(b-2)(1) is not implicated by the Service Fees at all.

*Second*, Plaintiff's interpretation wrongly conflates a landlord's duty to ensure a tenant's unit is habitable with the landlord being obligated to pay for the tenant's utilities.  D.C. Code § 42-3505.10(b-2)(1) requires the former and does not mention the latter.  *See* D.C. Code § 42-3505.10(b-2)(1) (stating a housing provider "shall not charge a fee . . . to maintain a unit in a condition consistent with the implied warranty of habitability").  Section 42-3505.10(b-2), which has two subsections, addresses the **physical condition** of a tenant's unit, and provides that a landlord cannot charge a fee for "maintain[ing] a unit in a condition consistent with the implied warranty of habitability."  *Id*.  Both subsections focus on "the standard of ordinary wear and tear." *Id*.  None of this, of course, has anything to do with who pays for utilities.  Indeed, nothing in this section—or anywhere else in the D.C. Code or the D.C. Housing Code—requires a landlord to ***pay for*** the tenant's use of utilities, as Plaintiff claims.  If the D.C. Council had intended that result, it surely could have said so.  It did not, which is not surprising given that such a requirement would be contrary to common practice for thousands of tenants in the District.

*Third*, Plaintiff's interpretation of D.C. Code § 42-3505.10(b-2)(1) is at odds with the provision's legislative history.  The D.C. Council explained the competing interests that led to D.C. Code § 42-3505.10(b-2)(1) as follows:

> When a prospective tenant is able to find rental housing, their housing provider is required by law to maintain the unit in habitable condition that complies with statutory regulations.  Tenants are, in turn, responsible for maintaining their rented units within the bounds of the ordinary wear and tear of everyday living.  This balance can be offset **when housing providers charge tenants for repairs that housing providers are mandated to cover,** sometimes without the tenants' knowledge.

*See* Ex. B, Committee on Housing Report on B25-0074, p. 2 (emphasis added).

16

As this makes clear, D.C. Code § 42-3505.10(b-2)(1) is aimed at ensuring landlords don't charge tenants to keep a property habitable, such as by charging tenants for "ordinary wear and tear." Nothing in the legislative history supports Plaintiff's contention that the D.C. Council intended to require landlords to pay for tenants' utilities, let alone to prohibit landlords from requiring tenants to use third-parties (like Conservice or Metergy) to do so.[6]

Accordingly, Plaintiff cannot plausibly allege that the Service Fees were either misleading or violated D.C. law, and his Service Fees Claim should be dismissed.

### D. The Drip Pricing Claim Fails Under the CPPA

Next, Plaintiff claims that Brookfield used a "a drip and partitioned pricing scheme" (a/k/a "drip pricing") when it charged him the Metergy Fees—*that were expressly disclosed in his Lease*—without first including those Fees as part of the advertised "rent."

As noted above, the Metergy Fees were explicitly set forth in the Lease and the Utility Addendum, both of which Plaintiff signed. *Supra*, pp. 3–4. Plaintiff's allegations—that Brookfield "failed to disclose" those Fees "in [the] Lease," *see* Compl., ¶¶ 43–44—are thus contradicted by the very document that the Complaint relies upon. For this reason alone, Plaintiff's Drip Pricing Claim should be dismissed, as there was nothing misleading about the Metergy Fees as a matter of law. *See Whiting*, 701 F. Supp. 2d at 29; *Hirlinger*, 2024 WL 2941630, at *6.

---

[6]     Plaintiff's selective citation to this legislative history—claiming that the "purpose" of D.C. Code § 42-3505.10(b-2)(1) "was to make sure housing providers are not passing the costs for which they are responsible onto tenants," *see* Compl., ¶ 31—itself ignores the very next sentence of that legislative history, which makes clear that "housing providers may still require a security deposit but can only keep the deposit to cover items that **go beyond the standard of ordinary wear and tear on a unit.**" *See* Ex. B, Committee on Housing Report on B25-0074, p. 4 (emphasis added). Read in its entirety, this legislative history makes clear that the 2023 amendments relate to "ordinary wear and tear on a unit," not utility payments.

The crux of Plaintiff's Drip Pricing Claim—consistent with his near-exclusive reliance on inapplicable provisions of D.C. law—is his theory that the Metergy Fees qualify as "rent" under the D.C. Code. *See* D.C. Code § 42-3501.03(28) (defining "rent" as "the entire amount of money, money's worth, benefit, bonus, or gratuity demanded, received, or charged by a housing provider as a condition of occupancy or use of a rental unit, its related services, and its related facilities") *and* D.C. Code § 42-3501.03(27) (defining "related services" as "services provided by a housing provider . . . to a tenant in connection with the use and occupancy of a rental unit, including . . . the provision of light, heat, hot and cold water, air conditioning . . . ."). Plaintiff's expansive interpretation of "rent" is wrong as a matter of D.C. law.

The D.C. Superior Court's recent decision in *Nanan v. Hines* is instructive. *Nanan v. Hines*, No. 2024 LTB 850, 2024 WL 4697067 (D.C. Super Ct. Nov. 06, 2024). There, Judge Edelman analyzed the same question posed here: when "utility bills at issue [] constitute 'rent' under D.C. Code § 42-3501.03(28)." *Id.* at *3. As the Court rightly noted, "[i]n its most expansive and literal definition, essentially every obligation of tenancy could be characterized as fitting within [the language of § 42-3501.03(28)]." *Id.* at *4. Nevertheless, the Court concluded "that expansive reading makes little sense." *Id.*

Specifically, the Court provided two instructive guideposts for determining when a payment constitutes rent: (1) "the language of the [l]ease," including whether it "explicitly defin[es] the monthly payments to the landlord as the rent, which makes other obligations, by exclusion, not rent"; and (2) whether "the utilities are not paid directly to the landlord, but to a third party." *Nanan*, 2024 WL 4697067, at *5. The Court concluded that the utility payments to third-party providers in *Nanan* did not constitute "rent" because the lease and related contracts "(a) require fixed monthly payments to the landlord, (b) explicitly label these payments as 'rent,' (c)

state in different sections of the documents the requirement to pay utility bills, and (d) require

those bills be paid directly to the utility providers." *Id*.

Each of the *Nanan* court's conclusions applies equally to Plaintiff's Drip Pricing Claim

here in light of the plain language of the Lease and the Utility Addendum:

- The Lease explicitly defines "Rent" as a fixed monthly amount equal to $2,673.00. *See* Ex. A, Lease, p. 1; *id.* at § 2 ("The monthly rental payment (the 'Rent') shall be the amount shown above [$2,673.00].").

- The Lease further requires that "Rent" be paid to Brookfield. *See id.* at § 2 ("Rent . . . should be made payable to 'Brookfield Properties Multifamily, LLC' . . . .").

- The Metergy Fees are set forth in a different section of the Lease—the Utility Addendum—and explicitly require any bill be paid directly to Metergy. *See supra*, p. 4 (discussing Utility Addendum at §11).

Just as in *Nanan*, the Metergy Fees do not constitute "rent" under D.C. Code § 42-

3501.03(28). Instead, as the Lease and the Utility Addendum expressly state, Plaintiff's "rent" is

his $2,673.00 per month paid to Brookfield, not the other utility charges and fees paid to Metergy.

For this reason, too, Plaintiff's Drip Pricing Claim fails.

Finally, to the extent that Plaintiff's Drip Pricing Claim separately alleges that the Metergy

Fees violate D.C. Code § 28-3904(h), the Claim should also be dismissed because he fails to plead

any facts regarding Brookfield's allegedly unlawful intent. In his Complaint, Plaintiff only offers

the conclusory allegation that, "[u]nder the CPPA, it also violates District law to 'advertise or offer

goods or services without the intent to sell them or without the intent to sell them as advertised or

offered.'" Compl., ¶ 39 (citing D.C. Code § 28-3904(h)). This is insufficient to plead intent under

the CPPA. *See, e.g., Grayson*, 15 A.3d at 252 (holding that plaintiff failed to adequately allege a

D.C. Code § 28-3904(h) claim because he "did not provide any facts that show the unlawful intent

of [defendants]").

19

E.      **The Catch-All Allegations Fail Under the CPPA**

Finally, in addition to alleging the above violations of the D.C. Code, D.C. Housing Code, and CPPA, Plaintiff also formulaically alleges that each of his theories establish: (1) a deceptive and/or unfair trade practice prohibited by Section 3904 of the CPPA; (2) a failure to state a material fact (i.e., the alleged illegality of the fee), or a use of ambiguity as to a material fact (again, the alleged illegality of the fee), that tends to mislead prohibited by Sections 3904(f) and 3904(f-1) of the CPPA respectively; and (3) an unconscionable lease term prohibited by Section 3904(r) of the CPPA. Compl., ¶ 61.a-e. These generalized, catch-all allegations similarly fail to state a claim for relief under the CPPA.

i.      *Plaintiff Fails to Allege a Deceptive and/or Unfair Trade Practice*
         *Prohibited by Section 3904*

As set forth above, Plaintiff fails to allege any deceptive or unfair practice because the Lease and the Utility Addendum expressly disclosed all of the complained-of terms and fees here. *Supra*, pp. 3–4. "[A] claim of an unfair trade practice [under the CPPA] is properly considered in terms of how the practice would be viewed and understood by a reasonable consumer." *Pearson*, 961 A.2d at 1075. Reasonable consumers understand the explicit terms of a lease they've signed. Plaintiff cannot simply ignore the clear and unambiguous provisions of his Lease and Utility Addendum to conjure up an unfair trade practice claim under Section 3904 here. *See Whiting*, 701 F. Supp. 2d at 29; *Hirlinger*, 2024 WL 2941630, at *6.

Separately, Plaintiff's allegations regarding "unfair trade practices" are also insufficient to support a claim under D.C. Code § 28-3905(k)(1)(A)—the main basis for his claims here, *see* Compl., ¶ 61.a-e—because his allegations primarily allege harm to the general public. *See* Compl., ¶ 16 (alleging harm to "potential tenants," "prospective tenants," and "tenants" as a whole); *id.* at ¶ 25 (alleging harm to "tenants" and "consumers" as a whole); *id.* at ¶ 35 (alleging harm to

"consumers" as a whole); *id.* at ¶ 46 (alleging harm to "tenants" and "consumers" as a whole).[7]

To the extent his Complaint is devoid of any individualized harm, he cannot proceed under D.C.

Code § 28-3905(k)(1)(A).  *See Grayson*, 15 A.3d at 246–47 (affirming dismissal of claim when

plaintiff "does not claim to have been personally injured by" defendant).  For this reason, too, the

Court should dismiss Plaintiff's "unfair trade practice" claims.

> ii.      *Plaintiff Fails to Allege a Violation of Section 3904(f) or (f-1)*

Plaintiff also fails to allege a violation of either D.C. Code § 28-3904(f) (a failure to state

a material fact that tends to mislead) or D.C. Code § 28-3904(f-1) (a use of ambiguity as to a

material fact that tends to mislead).  These provisions are only mentioned in his causes of action;

Plaintiff fails to allege any facts to support these claims.  *See* Compl., ¶ 61a.-e.  As a result, there

is insufficient "factual matter, accepted as true, to state a claim to relief that is plausible on its

face" and these claims should be dismissed.  *Florio*, 119 F.4th at 73.

Plaintiff's allegations further fail to allege a CPPA violation under D.C. Code §§ 28-

3904(f) and (f-1) because they rest on alleged opinions and assessments of law, not statements of

fact.  *See, e.g., Floyd*, 70 A.3d at 255 (dismissing CPPA claim under Section 28-3904(f) because

the alleged failure by the defendant bank to inform plaintiff "about the inapplicability of U.S. legal

protections" is "a legal assessment . . . not a fact"); *Salvador v. Allstate Prop. & Cas. Ins. Co.*, No.

CV 19-2754 (RJL), 2020 WL 7042843, at *3 (D.D.C. Nov. 30, 2020) (dismissing Section 28-

3904(f) claim because "legal assessments are insufficient to state a CPPA claim").

---

[7]      Independently, Plaintiff's policy arguments on behalf of the general public are also
insufficient to allege an unfair trade practice.  D.C. Code § 28-3901(d) provides that "due
consideration and weight shall be given to the interpretation by the Federal Trade Commission and
the federal courts of the term "unfair or deceptive act or practice."  D.C. Code § 28-3901(d).
Section 5 of the FTC Act specifically states that "public policy considerations may not serve as a
primary basis" in determining whether an act or practice is unfair.  15 U.S.C. § 45(n).

>           iii.        *Plaintiff Fails to Allege a Violation of Section 3904(r)*

Like his other catch-all allegations, the only mention of D.C. Code § 28-3904(r) is in Plaintiff's causes of action, devoid of any factual support. *See generally* Compl. "A viable claim under § 28-3904(r) requires allegations showing that a trade practice is 'unconscionable' as measured by several statutory factors set forth in § 28-3904(r)(1)-(5)." *Grayson*, 15 A.3d at 252 (dismissing CPPA claim under Section 3904(r) because the complaint only made conclusory allegations concerning the five factors in this CPPA subsection). The five factors enumerated in D.C. Code § 28-3904(r)(1)-(5) are:

>       (1) knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer;
>
>       (2) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased;
>
>       (3) gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees;
>
>       (4) that the person contracted for or received separate charges for insurance with respect to credit sales with the effect of making the sales, considered as a whole, unconscionable; and
>
>       (5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors.

Like in *Grayson*, Plaintiff's Complaint nowhere pleads facts supporting any of the five factors enumerated in D.C. Code § 28-3904(r)(1)-(5). Moreover, four of those five factors are not even arguably applicable here, because Plaintiff's allegations are not related to credit sales; price disparities; insurance charges; or to Plaintiff's age, physical or mental infirmities, or other similar factors. *See, e.g.,* D.C. Code § 28-3904(r)(1), (r)(3), (r)(4), and (r)(5). Nor does the Complaint

allege any facts that would plausibly establish knowledge by Brookfield of Plaintiff's "inability . . . to receive substantial benefits from the property . . . sold or leased" to him as required under D.C. Code § 28-3904(r)(2). Accordingly, Plaintiff's claims under D.C. Code § 28-3904(r) also fail as a matter of law.

## <u>CONCLUSION</u>

For the reasons set forth herein, Brookfield respectfully requests that the Court grant its Motion and dismiss the Complaint in its entirety, with prejudice.

Dated: March 11, 2025

Respectfully submitted,

*/s/ Benjamin E. Horowitz*

**VENABLE LLP**
Benjamin E. Horowitz (Bar No. 1017262)
Elizabeth C. Rinehart (Bar No. 1617790)
Brian D. Koosed (Bar No. 1034733)
600 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 344-4494 (Tel.)
(202) 344-8300 (Fax)
BEHorowitz@Venable.com
LCRinehart@Venable.com
BDKoosed@Venable.com

*Attorneys for Defendant*
*Brookfield Properties Multifamily, LLC*