# EXHIBIT B

# COMMITTEE ON HOUSING
## ROBERT C. WHITE, JR., CHAIR
### COUNCIL OF THE DISTRICT OF COLUMBIA

**MEMORANDUM**

| | |
|---|---|
| **TO:** | Members of the Council of the District of Columbia |
| **FROM:** | Councilmember Robert C. White, Jr. |
| | Chair, Committee on Housing |
| **DATE:** | June 22, 2023 |
| **RE:** | Report on Bill 25-0074, the "Fairness in Renting Clarification Amendment Act of 2023" |

The Committee on Housing reports favorably on B25-0074, the "Fairness in Renting Clarification Amendment Act of 2023," and recommends its approval by the Council of the District of Columbia.

## CONTENTS

Background and Need..................................................................................................... 1
Purpose and Effect ....................................................................................................... 3
Chronology of Action ................................................................................................... 6
Position of the Executive .............................................................................................. 6
Recommendations of Advisory Neighborhood Commissions......................................... 7
Summary of Witness Testimony..................................................................................... 7
Impact on Existing Law ................................................................................................ 9
Fiscal Impact............................................................................................................... 10
Section-by-Section Analysis........................................................................................ 10
Summary of Committee Mark-Up ............................................................................... 11
List of Attachments ..................................................................................................... 12

## BACKGROUND AND NEED

According to Census and rental market data, 42% of District of Columbia residents are homeowners, while 58% are renters.[1] This distinction is even more prevalent in households led by people of color: In 2020, just 36% of Black residents and 32% of Latine residents owned homes, for an average of 36% homeownership among all people of color.[2] Within the rental market, people of color face additional burdens, articulated by the Council Office of Racial Equity (CORE) in a previous Racial Equity Impact Assessment (REIA):

> Racial inequities in homeownership mean that households of color are more likely to rent—and when they rent, their rent is more likely to be unaffordable. One metric for affordability is rent burden, which measures what percentage of a household's

---

[1] U.S. Census Bureau, *QuickFacts: District of Columbia*, https://www.census.gov/quickfacts/fact/table/DC# (last visited June 15, 2023); RentCafe, *Washington, DC Rental Market Trends*, Feb. 2023, https://www.rentcafe.com/average-rent-market-trends/us/dc/washington/#:~:text=181%2C384%20or%2058%25%20of%20the,42%25%20are%20owner%2Doccupied.

[2] National Equity Atlas, *Homeownership: District of Columbia*, 2023, https://nationalequityatlas.org/indicators/Homeownership?geo=02000000000011000.

income goes to rent. The higher the percentage, the higher the burden. Black and Hispanic households experience the highest rates of rent burden in the District, with more than one in two households spending over 30% of their income on rent . . . . Racial inequities in education, hiring discrimination, job segregation, wealth inequities, and income inequities all contribute to the inequities in rent burden.[3]

Relatedly, housing costs continue to rise, as do the costs of everyday necessities. Due to the heightened income inequality described by CORE above, the burden of any costs associated with housing – including paying application fees to seek access to rental housing – are more detrimental to communities of color, as Black, Latine, and other residents of color spend a higher percentage of their income on such costs compared to white residents who routinely have more wealth. Heightened costs and less income force communities with lower incomes to manage their money even more carefully so their dollars stretch to the end of each month, leaving little wiggle room for extra payments. In instances where a person is seeking housing, this may result in pursuing fewer options because of the cumulative cost of application and other fees that housing providers charge to evaluate prospective tenants.

When a prospective tenant is able to find rental housing, their housing provider is required by law to maintain the unit in habitable condition that complies with statutory regulations.[4] Tenants are, in turn, responsible for maintaining their rented units within the bounds of the ordinary wear and tear of everyday living. This balance can be offset when housing providers charge tenants for repairs that housing providers are mandated to cover, sometimes without the tenants' knowledge.

In March of 2022, the Council passed B24-0096, the "Eviction Record Sealing Authority and Fairness in Renting Amendment Act of 2022," combining concepts from three separate proposed bills focused on protecting tenants' rights.[5] Part of the law clarified the amount in fees that housing providers are allowed to collect from prospective tenants prior to signing a lease, presumably to cover the cost of screening a prospective tenant for suitability in renting a unit.[6] Since the law's passage, tenants and tenant attorneys noticed a pattern of housing providers

---

[3] Dr. Brian McClure, *Bill 24-0096, Racial Equity Impact Assessment on the Eviction Record Sealing Authority and Fairness in Renting Amendment Act of 2021*, Council Office of Racial Equity, Nov. 30, 2021, *available at* https://www.dropbox.com/s/nejlhn7ljj8js3y/B24-0096%20Eviction%20Record%20Sealing%20Authority%20Amendment%20Act%20of%202021.pdf?dl=0.

[4] *See, e.g.*, DC Office of the Tenant Advocate, *District of Columbia Tenant Bill of Rights*, October 2009, *available at* https://ota.dc.gov/sites/default/files/dc/sites/ota/publication/attachments/2009_10_27_OTA_DC_Tenant_Bill_of_Rights_FOR_SH_COMMENT.pdf.

[5] The three bills were B24-0096, the "Eviction Record Sealing Amendment Act of 2021," introduced by Councilmember Mary Cheh; B24-0106, the Fair Tenant Screening Act of 2021," introduced by Councilmembers Vincent Gray, Brianne Nadeau, and Trayon White; and B24-0119, the "Eviction Protections and Tenant Screening Amendment Act of 2021," introduced by Chairman Phil Mendelson. For a summary of the combined bills' legislative history, see the Committee on Housing and Neighborhood Revitalization Committee Report on B24-0096, available at https://lims.dccouncil.gov/downloads/LIMS/46603/Committee_Report/B24-0096-Committee_Report1.pdf?Id=130840.

[6] The Rental Housing Act of 1985 defines "housing provider" as "a landlord, an owner, lessor, sublessor, assignee, or their agent, or any other person receiving or entitled to receive rents or benefits for the use or occupancy of any rental unit within a housing accommodation within the District" and states that "'tenant' includes a tenant, subtenant, lessee, sublessee, or other person entitled to the possession, occupancy, or the benefits of any rental unit owned by another person." D.C. Code § 42-3501.03(15), (36). This report uses these same definitions.

charging application fees *plus* other similar fees that were named something else, like "processing fee." The intent of the Eviction Record Sealing Authority and Fairness in Renting Amendment Act of 2022 was to reduce barriers for people seeking access to rental housing in the District, not to allow housing providers to charge the same costs by another name. The bill discussed in this report seeks to address gaps and prevent loopholes in the law and to provide additional predictability for renters bearing the burdens of high rents, limited income increases, and discrimination within the housing market.

## PURPOSE AND EFFECT

On January 27, 2023, Councilmember Christina Henderson introduced B25-0074, with the support of Chairman Phil Mendelson and Councilmembers Anita Bonds, Brianne Nadeau, Charles Allen, Robert C. White, Jr., Trayon White, Sr., Brooke Pinto, and Janeese Lewis George, and Zachary Parker, as co-introducers. Councilmember Frumin requested to co-sponsor the measure on February 2, 2023. The Committee on Housing held a hearing on the bill on May 18, 2023, at which several witnesses requested the Committee make changes to tighten the language and prevent additional loopholes.

The purpose of the bill as introduced is threefold. Each purpose is identified in turn below, followed by corresponding changes in the committee print.

First, the bill as introduced was meant to address a gap in the current law that housing providers have used to charge prospective tenants both application fees and separate processing fees. The bill attempted to prevent this workaround by defining "processing fee" and by clarifying that housing providers can charge either an application fee or a processing fee, not both. The bill would have aligned the parameters of application fees and processing fees, including a $50 limit for processing fees that is adjusted yearly for inflation.

Chief Tenant Advocate Johanna Shreve, ANC 6E05 Commissioner Ahmad Abu-Khalaf, and a series of public witnesses – including Marta Beresin, DC Tenants' Rights Center Senior Attorney Leigh Higgins, Washington Legal Clinic for the Homeless Director of Policy and Advocacy Brittany K. Ruffin, and Legal Aid Society of the District of Columbia Supervising Attorney Mel Zahnd – each testified that rather than seeking to separately define each potential fee that a housing provider may charge, defining "application fee" more inclusively would better meet the intent. This Committee agrees and adjusted the committee print accordingly by including a definition of application fee that broadly covers "the total of any and all costs or fees" a housing provider charges a prospective tenant prior to signing a lease, which would include "processing fees."

The Committee also included guidelines around two other fees. First, the committee print adds a limitation on the amount a housing provider can charge an outgoing tenant who is seeking a replacement, assignee, or sublessee to the same amount permitted as an application fee. When tenants change within the same lease, housing providers incur additional administrative costs to ensure the proper tenant assumes legal liability and to process any outgoing paperwork.[7] However,

---

[7] *See, e.g.*, Rent the District, *Lease Substitution Fees Explained*, 2020, https://www.rentthedistrict.com/single-post/2017/05/10/lease-substitution-fees-explained (describing the costs associated with lease substitutions).

the Committee believes parameters on the amount housing providers can charge will prevent the "sheer exploitation" of tenants who have received permission to find a replacement tenant.[8] Second, the committee print states that a housing provider can only charge a tenant one application fee if the same tenant applies to multiple units within the housing provider's portfolio within 30 calendar days, unless the housing provider is required to complete more than one tenant screening.[9] Housing application fees are used to cover the costs of completing credit, background, and eviction checks of prospective tenants. According to the three credit bureaus, credit scores are typically updated about once a month.[10] Once completed, criminal background checks can be deemed valid in the District for at least two years.[11] Similarly, eviction processes take more than one month to complete.[12] Based on these timeframes, it is unlikely that a housing provider would gather new information from conducting the same tenant screening within one month. The committee print thus reflects these timelines and seeks to reduce unnecessary costs to prospective tenants.

Additionally, the committee print adds a cross reference to a judicial procedural provision under DC Official Code § 16–1501 that prohibits housing providers from filing to recover possession for non-payment of rent if the amount owed is under $600. Council passed a temporary law that will expire on July 26, 2023, which placed this prohibition in the Rental Housing Act of 1985. Council later passed a permanent version of the prohibition but moved it from the Rental Housing Act of 1985 to Title 16 of the DC Code. This internal cross reference clarifies this connection for ease of navigating tenant protections throughout District law.

Second, the bill as introduced would prohibit housing providers from charging fees of new or departing tenants for which the housing provider is lawfully responsible to maintain the habitability of a unit. Housing providers have a duty to maintain units in a condition rendered habitable under the implied warranty of habitability and under designated housing code regulations.[13] The purpose of this section was to make sure housing providers are not passing the costs for which they are responsible onto tenants. Under the bill, housing providers may still require a security deposit but can only keep the deposit to cover items that go beyond the standard of ordinary wear and tear on a unit.

---

[8] Testimony on B25-0074 by Chief Tenant Advocate Johanna Shreve at p. 7.

[9] Tenant screening is defined as "any process used by a housing provider to evaluate the fitness of a prospective tenant."  D.C. Code § 42-3505.10(j)(2).

[10] *See* Equifax, *How Often Does Your Credit Score Update?*, 2023, https://www.equifax.com/personal/education/credit-scores/how-often-does-your-credit-score-update/#:~:text=Your%20credit%20scores%20typically%20update%20at%20least%20once%0a%20month (at least once a month"); Experian, *How Often is my Credit Score Updated?*, Jan. 2020, https://www.experian.com/blogs/ask-experian/how-often-is-my-credit-score-updated/ ("Each creditor reports to the bureaus according to its own schedule—typically every 30 to 45 days."); TransUnion, *How Often Do Credit Scores and Reports Update?* March 2023, https://www.transunion.com/blog/credit-advice/how-long-does-it-take-for-a-credit-report-to-update ("once a month, or at least every 45 days");

[11] *See, e.g.*, DCPS, *DCPS Clearance Process*, 2023, *available at* Static1.squarespace.com/static/5bbd09f3d74562c7f0e4bb10/t/6447eaceced50f12e964ff6c/1682434767186/Housing+Budget+Report+-+Circulation+Draft+-+4.26.2023.pdf (stating DCPS volunteer clearance letters are valid for 2 years).

[12] *See* DC Bar Pro Bono Center, *Landlords: Evictions and Defenses*, March 2017, https://www.lawhelp.org/dc/resource/landlords-evictions-and-defenses (outlining DC's eviction process).

[13] *See* DC Office of the Tenant Advocate, *District of Columbia Tenant Bill of Rights*, October 2009, *available at* https://ota.dc.gov/sites/default/files/dc/sites/ota/publication/attachments/2009_10_27_OTA_DC_Tenant_Bill_of_Rights_FOR_SH_COMMENT.pdf.

The committee print maintains the intent of this provision with a few clarifying additions. The committee print includes additional specificity with respect to a housing provider's duty to comply with both implied and express, or regulatory, warranties to maintain their properties and clarifies that the protections apply to prospective, current, and outgoing tenants. The committee print also prohibits a housing provider from charging a tenant a professional cleaning fee so long as the tenant returns the unit in a condition commensurate with the standard of ordinary wear and tear.

Third, the bill as introduced would require housing providers to give 60 days' instead of 30 days' notice of a potential rent increase, with the goal of granting tenants more predictability in their rental payments and providing a greater window of time to search for new housing if the increase is no longer affordable for the tenants.

The committee print keeps this language and, for the same purpose, adds a correlating provision that increases the amount of time a tenant has to decide whether to absorb increased rent or to vacate the unit from 15 days to 30 days after receiving their housing provider's notice of intent to raise the rent.

*Suggestions considered but not included in the committee print*

DC Office of Human Rights (OHR) Director Hnin Khaing submitted written testimony discussing OHR's role as the body responsible for enforcing new tenant rights provisions in the Rental Housing Act of 1985, as recently passed in the Eviction Record Sealing Authority and Fairness in Renting Amendment Act of 2022. In her testimony, Director Khaing separated OHR cases into two categories: compliance statutes and anti-discrimination cases. Under existing law, OHR must process complaints brought under the Eviction Record Sealing Authority and Fairness in Renting Amendment Act of 2022 through the same comprehensive investigatory procedures as Human Rights Act anti-discrimination cases. Director Khaing posited that this more extensive process is unnecessary for compliance provisions in the law for which OHR can clearly determine a violation without a probable cause finding. She shared that such a change in the Rental Housing Act of 1985 would mirror the streamlined process that Council already passed in Bill 24-0109, the "Cannabis Employment Protections Amendment Act of 2022."

While the Committee appreciates OHR's position and agrees with the premise, the Committee did not include the suggested change in its committee print for a few reasons. This proposed change was not included in the bill as introduced nor in the hearing notice description. Accordingly, the Committee did not hear testimony from public witnesses who may have been able to provide additional feedback on this adjustment. While committees and the Council may amend laws as they see fit regardless of the introduced version of a bill, the Committee felt it would be a better practice to visit this distinction more holistically to concurrently adjust other compliance-based statutes, if determined that was the most appropriate course of legislative action. The Committee will continue discussing this matter with the Committee on Public Works and Operations, which has oversight over OHR, as well as with OHR and others familiar with the limitations and time constraints of the current OHR processes that Director Khaing discussed in her testimony.

## CHRONOLOGY OF ACTION

Jan. 27, 2023          B25-0074 introduced by Councilmember Henderson, Chairman Mendelson, and Councilmembers Bonds, Nadeau, Allen, R. White, T. White, Pinto, Lewis George, and Parker,

Feb. 02, 2023          Councilmember Frumin requested to co-sponsor B25-0074

Feb. 03, 2023          Notice of Intent to Act on B25-0074 published in the District of Columbia Register

Feb. 07, 2023          B25-0074 referred to the Committee on Housing

March 21, 2023        Notice of Public Hearing filed in the Office of the Secretary

March 24, 2023        Notice of Public Hearing published in the District of Columbia Register

May 18, 2023          Public Hearing on B25-0074

June 21, 2023          Notice of Mark-Up filed in the Office of the Secretary

June 22, 2023          Committee Mark-Up

## POSITION OF THE EXECUTIVE

*Colleen Green, Director of the Department of Housing and Community Development (DHCD)*, testified in support of the intent of this legislation.

*Johanna Shreve, Chief Tenant Advocate in the Office of the Tenant Advocate (OTA)*, testified in support of the intent of the measure and recommended several changes: use a definition of "application fee" to capture any and all costs, rather than individually defining other fees; limit fees for replacement tenants and for applications to multiple units within the same housing provider's portfolio; grant tenants 30 days, rather than 15 days, to determine whether to absorb a rent increase or to vacate a unit; require housing providers serve notices of increases to the Rent Administrator concurrently upon service to the tenant; prohibit fees to incoming, outgoing, *and existing* tenants for maintaining the habitability of a unit; and prevent charges for professional cleaning if the unit is within the allowable standard of ordinary wear and tear upon the return by the tenant.

*Hnan Khaing, Director of the Office of Human Rights (OHR)*, provided written testimony recommending that Council adjust the OHR complaint process for compliance-based housing cases to align with the streamlined OHR procedures Council passed in B24-0109, the "Cannabis Employment Protections Amendment Act of 2022."

## RECOMMENDATIONS OF ADVISORY NEIGHBORHOOD COMMISSIONS

No Advisory Neighborhood Commissions (ANC) have submitted recommendations on this measure to the Council or posted resolutions regarding this measure to https://resolutions.anc.dc.gov. Two ANC Commissioners representing Single Member Districts (SMD) testified on the measure.

*Commissioner Trupti Patel, ANC 2A03*, supported the measure but said the measure does not go far enough and should incorporate the changes suggested by other witnesses and add a provision that requires landlords to refund application fees if a prospective tenant does not obtain the unit. Commissioner Patel said the measure will alleviate some of the burdens and inequities faced by renters, which, in addition to low or no credit, keep people trapped in their current housing situations. Commissioner Patel cited Matthew Desmond's book *Evicted* and shared that various fees have allowed for economic violence against the poor, particularly those wanting to shift out of public housing.

*Commissioner Ahmad Abu-Khalaf, ANC 6E05*, testified for the first time in his capacity as a first-term ANC Commissioner and supported the measure with recommended suggestions, including using broad language to clarify what "application fee" means and clarifying the maximum allowable amount housing providers can charge prospective tenants in application fees. Commissioner Abu-Khalaf shared his personal experience with paying a $500 holding fee up front for a rental unit, which he said was exclusionary by design for prospective tenants without disposable income, and stated a desire to address these fees on voucher holders. Commissioner Abu-Khalaf also discussed his research into other jurisdictions and cited an article that says New York sets a $20 application fee cap and allows for reusable tenant screening applications.

## SUMMARY OF WITNESS TESTIMONY

On May 18, 2023, the Committee on Housing held a public hearing on B25-0074, among other legislation. A video recording of the hearing is available online at https://dc.granicus.com/MediaPlayer.php?view_id=56&clip_id=8295.[14] The public hearing record remained open until the close of business on June 1, 2023. Public witness testimony that the Committee received on B25-0074 prior to the close of the record is summarized below. Witnesses whose testimony pertained exclusively to the other bills on the agenda are not listed here. Witnesses whose testimony pertained to matters outside of the bills on the agenda are noted below.

*Rachelle Ellison, Senior Mentor Advisor/Lead of Rhonda Whitaker Streets to Life DC, People for Fairness Coalition*, supported the measure. Ellison discussed how apartments charge exuberant administrative fees that feel like a form of discrimination against people who have vouchers. Regarding the proposed increase from 30 to 60 days' notice of a rent increase, Ellison highlighted the importance of the additional time for people to find suitable housing, as it can

---

[14] All DC Council hearings can be found online at https://oct.dc.gov and at https://dccouncil.gov/hearings/. Committee on Housing hearings can also be found online at https://www.youtube.com/@committeeonhousingdc/streams.

reduce stress on tenants.

*Robert Warren, Director, People for Fairness Coalition*, supported the measure. Warren shared that this measure impacts many individuals and families trying to navigate accessing housing and noted that elderly and youth are dying on the streets because of unfair rental practices. Warren affirmed these amendments are needed to bring about housing justice.

*Nikila Smith, Co-Lead, Rhonda Whitaker Streets for Life DC*, shared her experiences and observations of the effects of housing struggles, mentioning the heartbreak she felt knowing people had nowhere to go after an April 2023 encampment closure. Smith expressed how hard it is to testify in front of anyone about things you don't have and how people who live on the streets continue having to play the waiting game to access housing.

*Craig London, Board Member, DC Housing Provider's Association*, testified with a proposal that he stated was related to fairness to renters but that did not specifically target what was in the measure. London proposed a program where the DC government would assist owners that operate properties with many voucher holders to co-locate case management in the buildings. London said buildings would, at no charge, provide the office space for on-site case management services with a goal of increasing fairness for all building residents by providing supports to those in need.

*Penda Byrd, Public Witness*, testified about concerns with the District of Columbia Housing Authority and did not address this measure.

*Marta Beresin, Public Witness,* supported the measure with recommended changes: clarify the $50 application fee is per household, not per adult member of the household; define "application fee" to include processing and other fees, rather than individually defining processing fee; and require housing providers who offer lease-up concessions to divide them across the life of the lease for tenants using vouchers to pay for their unit.

*Leigh Higgins, Senior Attorney, D.C. Tenants' Rights Center*, supported the measure with recommended changes: make clear that a housing provider cannot charge both an application fee and a processing fee, that an application fee is per unit rather than per person, and that no other fee can be charged by defining "application fee" broadly. Higgins also shared suggestions for more closely amending laws around security deposits, such as clarifying that the law currently has a non-exclusive list of impermissible withholdings.

*Brittany K. Ruffin, Director of Policy and Advocacy, The Washington Legal Clinic for the Homeless*, supported the measure with recommended changes – namely, to define "application fee" broadly and inclusively, rather than individually defining processing and other fees separately. Ruffin also shared the history of a tenant barriers-focused group that began in 2015 as a workgroup of the Interagency Council on Homelessness and later separated to become an "independent community coalition" focusing on the biggest barriers to obtaining housing.

*Curtis Alston, Housing Case Manager, Metropolitan Educational Solutions*, supported the measure and shared that he has many clients who face rental discrimination and who have to pay

excessive, non-refundable fees during the application process. Alston recommended implementing a cap for all application fees and imposing a fine on landlords who fail to comply with their requirement to provide an explanation for denying a prospective renter; Alston shared that landlords often overlook and ignore the explanation of a denial.

*Katalin Péter, Vice President of Government Affairs, Apartment of Office Building Association of Metropolitan Washington*, raised questions about with whom the drafters of the bill spoke about the screening process, Council's legislative decisions around notice timelines for housing providers versus tenants, and the District's practice of changing landlord tenant laws through emergency and temporary legislation. Péter emphasized that her understanding was that the application and processing fee are one in the same and expressed a desire to work with any third-party providers who have a different understanding.

*Mel Zahnd, Supervising Attorney, Legal Aid Society of the District of Columbia*, supported the measure with recommended changes – namely, define "application fee" to include processing and any other fees. Zahnd also supported the provisions that increase notice of rent increases and that prevent housing providers from shifting the financial obligation of maintaining the habitability of a unit onto tenants.

*Reginald Black, Housing Liaison, Serve Your City/Ward 6 Mutual Aid*, supported the measure and supported the stance and viewpoints of the People for Fairness Coalition. Black shared how rental fees are arbitrary at best and need to be capped or eliminated, particularly because they create barriers for people unstably housed and returning from homelessness. Black said these barriers represent a hole in our system, in which 86% of unhoused neighbors and over 90% of undomiciled deaths reported by the Chief Medical Officer every year are Black Americans. Black testified that most of those residents could be housed but for the prohibitive fees.

*Trayawn Brown, Public Witness*, testified about concerns with the District's Inclusionary Zoning Program and did not address this measure.

*Karen Lundregan, Public Witness,* shared her personal experience as a current voucher holder using the District's housing programs, including landlords requiring her to put down two month's security deposit due to her lack of credit, landlords attempting to raise her rent because she has a voucher, being charged $300 in housing application fees, and not being given the appropriate notifications required by the District's tenant screening laws. Lundregan asserted a desire for housing laws to be more strictly enforced and noted that even pro bono firms are at capacity and cannot accept more clients.

## IMPACT ON EXISTING LAW

The committee print would make several amendments to the Rental Housing Act of 1985:

First, the committee print adds a definition of "application fee" and makes clear that housing providers cannot charge any fees other than an application fee prior to signing a lease with a prospective tenant.

Second, the committee print adds a provision that restricts housing providers from charging

a tenant seeking to find a replacement tenant, assign the lease, or sublet more than the amount allowed under the law for an application fee.

Third, the committee print adds a provision that restricts housing providers from charging a prospective tenant multiple application fees if the prospective tenant applies to multiple units within a housing provider's portfolio within a 30-day period.

Fourth, the committee print adds a provision that restricts housing providers from charging fees to incoming, current, or outgoing tenants for unit conditions that are consistent with the standard of ordinary wear and tear and for which the landlord is responsible to maintain a unit in a condition consistent with the implied warranty of habitability and regulatory requirements.

Fifth, the committee print increases the amount of notice a housing provider is required to provide a tenant upon a proposed rent increase. A housing provider would be required to provide 60 days', rather than the current 30 days', notice of a rent increase to a prospective tenant. A housing provider would also be required to give 30 days', rather than the current 15 days', notice of a rent increase before the tenant is required to provide the housing provider with a notice of intent to vacate a unit.

Lastly, the committee print adds a cross reference to a judicial procedural provision under D.C. Official Code § 16–1501 that prohibits housing providers from filing to recover possession for non-payment of rent if the amount owed is under $600.

## FISCAL IMPACT

The Office of the Chief Financial Officer has determined that funds are sufficient in the Fiscal Year 2023 budget and the Fiscal Year 2024 through Fiscal Year 2027 budget and financial plan to implement the bill.

## RACIAL EQUITY IMPACT

Under Council Rule 311, the Council Office on Racial Equity (CORE) issued a Racial Equity Impact Assessment (REIA) for the committee print version of this legislation, attached to this report. CORE concluded that B25-0074 will likely improve economic and housing outcomes for Black, Latine, and other residents of color in the District of Columbia. CORE suggested that further consideration is needed to assess the negative racial equity impacts of background checks more generally.

## SECTION-BY-SECTION ANALYSIS

Sec. 1. Provides the short title of the legislation.

Sec. 2. Amends the Rental Housing Act of 1985 by defining "application fee"; adding a cross reference to D.C. Official Code § 16–1501, which prohibits housing providers from filing to recover possession for non-payment of rent if the amount owed is under $600; making clear a housing provider cannot charge a prospective tenant a fee other than an application fee prior to signing a lease; restricting the amount a

housing provider can charge a tenant who is seeking a replacement tenant, assignee, or sublessee to the law's permitted application fee amount; restricting housing providers from charging a prospective tenant multiple application fees if the prospective tenant applies to multiple units within a housing provider's portfolio within 30 calendar days; prohibiting housing providers from charging fees to incoming, current, or outgoing tenants for unit conditions that are consistent with the standard of ordinary wear and tear and for which the landlord is responsible to maintain a unit in a condition consistent with the implied warranty of habitability and regulatory requirements; increasing the amount of notice housing providers must provide tenants with notice of a rent increase before the tenant must provide the housing provider with a notice of intent to vacate from 15 days to 30 days; and increasing the amount of notice housing providers must provide tenants of a notice of a rent increase from 30 days to at least 60 days.

Sec. 3.  Adopts the fiscal impact statement in this report.

Sec. 4.  Indicates the effective date.

## SUMMARY OF COMMITTEE MARK-UP

On June 22, 2023, the Committee on Housing held a Committee Meeting to consider B25-0074. Chairperson Robert C. White, Jr., recognized the presence of a quorum consisting of himself and Councilmembers Brooke Pinto and Zachary Parker. The Chair also provided the following statement on this measure:

Next and final bill is Bill 25-74, the "Fairness in Renting Clarification Amendment Act of 2023." Councilmember Henderson introduced this bill earlier this year, and I was happy to co-introduce it. The bill as introduced was intended to do three things to reduce costs and improve transparency for tenants: First, the bill defined "processing fee" and only allowed housing providers to charge either a maximum $50 application fee or $50 processing fee, not both. Second, the bill prohibited housing providers from shifting the cost of maintaining a habitable living space onto incoming or outgoing tenants – a cost that housing providers must cover under the law. Third, the bill required landlords to give tenants 60 days' notice of a rent increase, rather than the current 30 days.

Committee staff worked with attorneys and the Office of the Tenant Advocate, who are familiar with the Rental Housing Act in practice, to adjust the bill's language and further meet its intent. For example, rather than defining a new "processing fee", the updated bill defines "application fee" broadly to include any and all fees a prospective tenant must pay prior to signing a lease. The updated bill also limits the amount a housing provider may charge a tenant for subletting their unit, includes the laws that housing providers are accountable to in maintaining their units, and aligns notice requirements within the Rental Housing Act to make sure tenants have time to determine whether they can absorb a rent increase or need to tell their housing provider they'll be moving.

I want to thank those who testified on this bill and those who worked with the Committee team throughout this process. Your insights and edits were imperative to making sure the language aligned with Council's intent. I am hopeful this bill will provide additional clarity, predictability, and protections to the thousands of renters living and seeking to live in the District.

Upon the conclusion of the Chair's opening statement, he opened the floor for discussion. The Chair then moved the proposed committee print and report, with leave for staff to make technical and conforming amendments.

### *Dissenting, Separate, and Individual Views of Committee Members*

None.

### *Amendments or Other Motions*

None.

### *Vote on the Measure and Report*

Yes: Councilmembers Robert C. White, Jr., Brooke Pinto, and Zachary Parker

No: None

Present: None

Absent: Councilmembers Kenyan R. McDuffie and Matthew Frumin

## <u>LIST OF ATTACHMENTS</u>

(1)    Introduced Measure and Memorandum of Referral
(2)    Racial Equity Impact Assessment
(3)    Fiscal Impact Statement
(4)    Legal Sufficiency Determination
(5)    Comparative Print
(6)    Committee Print

**ATTACHMENT 1**

1
2     Chairman Phil Mendelson                    Councilmember Christina Henderson
3
4
5     Councilmember Brianne K. Nadeau            Councilmember Charles Allen
6
7
8
9     Councilmember Zachary Parker               Councilmember Trayon White, Sr.
10
11
12
13
14
15    Councilmember Anita Bonds                  Councilmember Brooke Pinto
16
17
18
19
20    Councilmember Robert C. White, Jr.         Councilmember Janeese Lewis George
21
22                                A BILL
23
24                            _____
25
26
27             IN THE COUNCIL OF THE DISTRICT OF COLUMBIA
28
29                     _____
30
31
32    To amend the Rental Housing Act of 1985 to limit the amount of fees that a housing provider
33            may charge a prospective tenant associated with processing an application for rental
34            housing and to increase the notice period for rent increases from 30 days to 60 days.
35
36           BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this
37    act may be cited as the "Fairness in Renting Clarification Amendment Act of 2023.".
38           Sec. 2. The Rental Housing Act of 1985, effective July 17, 1985 (D.C. Law 6-10; D.C.
39    Official Code § 42-3501.01 *et seq.*), is amended as follows:
40           (a) Section 103 (D.C. Official Code § 42-3501.03) is amended by adding a new
41    paragraph (24A) to read as follows:

42        "(24A) "Processing fee" means any fee associated with processing or reviewing an

43   application for rental housing.

44        (b) Section 510 (D.C. Official Code § 42-3505.10) is amended as follows:

45             (1) Subsection (a)(9) is amended by striking the phrase "; and" and inserting the

46   phrase "and processing fee; and" in its place.

47             (2) Subsection (b) is amended to read as follows:

48             "(b)(1) A housing provider may require a prospective tenant to pay an application

49   fee or a processing fee.

50             "(2) An application fee may not be more than $50; provided that

51   beginning on January 1, 2024, the application fee may be adjusted annually by the housing

52   provider, or his or her agent, commensurate with an increase in the Consumer Price Index for All

53   Urban Consumers published by the United States Bureau of Labor Statistics.

54             "(3) A processing fee may not be more than $50; provided that beginning

55   on January 1, 2024, the application fee may be adjusted annually by the housing provider, or his

56   or her agent, commensurate with an increase in the Consumer Price Index for All Urban

57   Consumers published by the United States Bureau of Labor Statistics..".

58             "(b-2) A housing provider shall not charge a fee to a prospective tenant before

59   move-in or to a tenant after move-out for services required of the housing provider to maintain a

60   unit in a condition consistent with the implied warranty of habitability; provided that nothing in

61   this subsection prohibits a housing provider from withholding a tenant's security deposit to

62   replace damaged items if the tenant has caused damage to the unit beyond the standard of

63   ordinary wear and tear as defined in section 217 of the Rental Housing Act of 1985, effective

64   July 17, 1985 (D.C. Law 6-10; D.C. Official Code § 42–3502.17).".

65        (3) Subsection (c) is amended by striking the phrase "paid by the prospective

66  tenant within a reasonable time, not to exceed 14 days." and inserting the phrase "and processing

67  fee paid by the prospective tenant within a reasonable time, not to exceed 14 days." in its place.

68        (c) Section 904(b) D.C. Official Code § 42-3509.04(b)) is amended by striking the phrase

69  "30 days" and inserting the phrase "60 calendar days" in its place.

70        Sec. 3. Fiscal impact statement.

71        The Council adopts the fiscal impact statement in the committee report as the fiscal

72  impact statement required by section 602(c)(3) of the District of Columbia Home Rule

73  Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

74        Sec. 4. Effective date.

75        This act shall take effect following approval by the Mayor (or in the event of veto by the

76  Mayor, action by the Council to override the veto), a 30-day period of congressional review as

77  provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December

78  24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of

79  Columbia Register.

# COUNCIL OF THE DISTRICT OF COLUMBIA
## 1350 Pennsylvania Avenue, N.W.
## Washington D.C. 20004

Memorandum

To :        Members of the Council

From :      Nyasha Smith, Secretary to the Council

Date :      Friday, February 3, 2023

Subject :   Referral of Proposed Legislation

Notice is given that the attached proposed legislation was introduced in the Office of the Secretary on Friday, January 27, 2023. Copies are available in Room 10, the Legislative Services Division.

TITLE: "Fairness in Renting Clarification Amendment Act of 2023", B25-0074

INTRODUCED BY: Councilmembers Henderson, Allen, T. White, Pinto, Lewis George, Nadeau, Parker, Bonds, and R. White

CO-SPONSORED BY: Councilmember Frumin

The Chairman is referring this legislation to the Committee on Housing.

Attachment
cc: General Counsel
Budget Director
Legislative Services

**ATTACHMENT 2**



| BILL 25-0074 | COMMITTEE PRINT |

# RACIAL EQUITY IMPACT ASSESSMENT
## FAIRNESS IN RENTING CLARIFICATION
## AMENDMENT ACT OF 2023

**TO:**      The Honorable Phil Mendelson, Chairman, Council of the District of Columbia
**FROM:**   Namita Mody, Director, Council Office of Racial Equity
**DATE:**    June 21, 2023

## COMMITTEE
Committee on Housing

## BILL SUMMARY
Bill 25-0074 limits the total cost of applying to a rental unit to $50 (max); prohibits landlords from charging a tenant more than $50 to process a sublet or tenant replacement; prohibits landlords from charging renter applicants multiple application fees when applying to more than one unit; prohibits cleaning fees for units left in a state of ordinary wear and tear; and requires landlords to give renters 60 days of notice before increasing their rent.

## CONCLUSION
Bill 25-0074 will likely improve economic and housing outcomes for Black, Latine, and other residents of color in the District of Columbia.

## FURTHER CONSIDERATIONS
Further consideration is needed on background checks—the driving force behind application fees—due to their negative racial equity impacts.

---

**Content Warning:** The following content touches on racism, racism, displacement, housing insecurity, eviction, and housing discrimination. Some or all of these issues may trigger a strong emotional response. We encourage you to use this knowledge in the way that is most helpful to you.

**1**

## DOCUMENT OVERVIEW

The document you are about to read is a Racial Equity Impact Assessment, a careful and organized examination of how Bill 25-0074 will affect different racial and ethnic groups. In other words, this assessment answers the question, "If Bill 25-0074 passes, how will it impact Black, Indigenous, and other residents of color in the District of Columbia?"

A bill is a draft document that the Council considers before deciding whether it should become a law. First, a Councilmember (or a group of Councilmembers) introduces a bill. This draft is referred to as the "introduced version." Then, the Chairman assigns the bill to committee(s) for consideration based on the topics covered in the bill. Four or five Councilmembers sit on each committee.

If the committee decides they would like to move the bill forward in the lawmaking process, the introduced version is presented at a public hearing. At a public hearing, residents, community organizations, government witnesses, and other stakeholders give input.

If the committee decides to continue moving the bill forward after the public hearing, the committee can make changes to the introduced version of the bill, including incorporating feedback from the public hearing. This updated version of the bill is referred to as the "committee print."

The next step in the lawmaking—or legislative—process is a meeting called a "markup." At a markup, the committee reviews the committee print and votes on whether to move it forward. If the committee vote passes, all thirteen Councilmembers then vote on whether the committee print should become law at a legislative meeting.

During Council Period 25 (from 2023-2024), the Council Office of Racial Equity can write up to two Racial Equity Impact Assessments (REIAs) while the Council is considering a bill.

First, we *must* write a REIA that analyzes the introduced version of the bill. We publish this REIA following the public hearing. If the committee decides to move the bill forward, we can also write a second REIA that analyzes the committee print. The REIA on the committee print is published ahead of the markup—this is the version you are reading now.

CORE previously published a REIA on the introduced version of Bill 25-0074 on June 15, 2023. After analyzing the changes made to the bill following the public hearing, CORE decided this additional REIA on the committee print was necessary to ensure that Councilmembers, Council staff, and residents have the most up-to-date assessment of how the bill will impact Black, Indigenous, and other residents of color. This REIA also identifies the changes between the bill's two versions and can be read by itself or as a follow-up to the REIA on the introduced version. CORE strongly encourages the full reading of both assessments.

For an in-depth explanation of the REIA process, see CORE's website.

We hope this overview of terms provides helpful context for the bill and our discussion of the bill's racial equity impacts.



**RACIAL EQUITY IMPACT ASSESSMENT: COMMITTEE PRINT, BILL 25-0074**          **2**

## BILL SUMMARY

*The following content summarizes Bill 25-0074 in plain language for the purposes of discussion. This explanation is not a substitute for reading the bill, or if passed, the law. Mentions of "bill" throughout this REIA refer to the committee print unless otherwise stated.*

Bill 25-0074 makes changes to what landlords can charge applicants and renters. Specifically, Bill 25-0074:

1) **Prohibits landlords from charging more than $50[1] total to apply for a rental unit.** Current law allows landlords to charge renters different fees to apply for a rental unit, such as application fees, processing fees, and administrative fees, among others.

2) **Prohibits landlords from charging tenants more than $50 to process a subletter or replace their occupancy with another tenant.**

3) **Limits landlords to charging only one application fee per renter applicant every 30 days.** Current law allows landlords and apartment buildings to charge application fees for every unit a person applies to. The bill limits application fees to one *per applicant* instead of one *per unit*.

4) **Prohibits landlords from charging professional cleaning fees for units left in a state of ordinary wear and tear.** Current law does not prevent landlords from charging professional cleaning fees for wear and tear.

5) **Prohibits landlords from charging fees to renters to cover wear and tear expenses.** Current law prohibits landlords from using a renter's security deposit to cover wear and tear expenses. As of now, landlords can charge additional fees to cover wear and tear.

6) **Requires landlords to give renters 60 days of notice before increasing their rent.** Current law requires 30 days of notice.

For reference, Figure 1 highlights some of the major changes to Bill 25-0115 between the introduced version and the committee print. Please note that not all changes are listed.

**FIGURE 1** **Bill 25-0074's committee print further expands protections for renter applicants and tenants.**

| CURRENT LAW | INTRODUCED VERSION | COMMITTEE PRINT |
|---|---|---|
| "Application fee" is not defined. No type of fee related to applying to a rental unit is defined. Application fees are restricted to $50. | Defines and limits **processing fees** similar to how current law limits application fees. | **Defines application fees broadly** to include processing fees and all fees related to applying for rental unit. As a result, **limits the total cost of applying to a rental unit to $50.** |
| *Not addressed.* | *Not present.* | **Limits costs to conduct a sublet or replace a tenant to no more than $50.** |

---

[1] $50 as of 2023. Starting on January 1, 2024, the fee can be increased by the same amount as the Consumer Price Index for All Urban Consumers. DC Code § 42–3505.10



| | | |
|---|---|---|
| *Not addressed.* | *Not present.* | Limits to **one application fee per renter applicant** every 30 days. |
| *Not addressed.* | *Not present.* | **Prohibits professional cleaning fees** for units left in a state of ordinary wear and tear. |

## BACKGROUND

To analyze the racial equity impacts of this bill, it is critical to understand the context surrounding the issue as well as data on current racial inequities. Below, we summarize research on application fees, renting in the District, and rent increases, evictions, and race.

*Of course, we have not captured all relevant information related to these topics. We encourage you to dive further into the research on your own or by using the linked footnotes as a starting point.*

### Application Fees

When applying for a rental unit, landlords and apartment buildings charge several fees to process the application and run a background check.[2] These fees are often referred to as application fees, processing fees, and administrative fees, to name a few. Application fees are the most common. Current law limits application fees to $50.[3]

Notably, before a landlord collects an application fee or screens a tenant, current law requires them to disclose the eligibility criteria for securing the unit,[4] the amount and purpose of each fee,[5] and the types of information that will be accessed as part of the screening.[6] Current law also requires landlords to refund the application fee to the renter within 14 days if they do not use the fee to conduct a background check.[7] However, landlords can still screen a renter applicant—knowing that the applicant will be denied—to retain the application fee. Research from the National Consumer Law Center on application fees found that "landlords charge application fees even if they know the applicant will never be eligible" which then "results in applicants paying fees even if they would be automatically rejected."[8]

In the US, nearly 70% of households who rent pay rental application fees when looking for housing.[9] These fees are often nonrefundable[10] and can be charged on a per-person basis—meaning that each adult in a household would pay a fee to apply for one unit.[11]

---

[2] White, Stephen Michael. "A Landlord's Guide Rental Application Fees." RentPrep, August 13, 2020.
[3] DC Code § 42–3505.10. Tenant screening. Note: $50 as of 2023. Starting on January 1, 2024, the fee can be increased by the same amount as the Consumer Price Index for All Urban Consumers.
[4] DC Code § 42–3541.02. Inquiries into certain arrests, accusations, and convictions.
[5] DC Code § 42–3505.10. Tenant screening.
[6] Ibid.
[7] Ibid.
[8] Nelson, Ariel, April Kuehnhoff, Chi Chi Wu, Steve Sharpe, and Anna Kowanko. "Too Damn High: How Junk Fees Add to Skyrocketing Rents." National Consumer Law Center, March 2023.
[9] Arnson, Gabe, Grant Brissey, Isabel Foley, Manny Garcia, Sadie Houston, Radmila Zelic Josimov, Susan Kelleher, Lauren Lowe, Ian Port, and Madison Donahue. "Consumer Housing Trends Report 2022." Zillow, 2022.
[10] Dunn, Eric. "The Case Against Rental Application Fees." *Georgetown Journal on Poverty Law and Policy*, Fall 2022.
[11] "Public Hearing for B25-0074, Testimony from Marta Beresin," May 18, 2023.



Application fees are also charged per unit, and most renters in the US typically submit two rental applications before they find a unit to rent.[12] Black and Latine[13] applicants, however, typically must submit three or more applications, meaning they pay more in application fees than white applicants.[14] They are also more likely to pay higher security deposits.[15] These increased renting costs for applicants of color are a result of rampant ongoing racial discrimination in the US rental market.[16]

Applying this national data to DC would translate to a Black or Latine renter applicant likely paying a minimum of $150 in applications fees (3 applications at $50 each—current law caps application fees at $50) before finding a unit to live in (Figure 2). This is in addition to other fees (processing fees, administration fees, etc.) which are likely added on top of the application fee. For example, during the bill's public hearing, the DC Chief Tenant Advocate submitted a fee quote given to them by an apartment building showing a household with two adults having to pay $600 to apply to one unit. It included a $50 application for each adult and a $500 administrative fee.[17] Notably, renter applicants with housing vouchers in the District— many of which are people of color—can also pay up to hundreds of dollars when applying for rental units given that landlords are more likely to deny their applications.[18]

**FIGURE 2** Black and Latine renter applicants in the US pay more application fees than white applicants.

| RACE AND ETHNICITY | MEDIAN NUMBER OF SUBMITTED RENTAL APPLICATIONS | APPLICATION FEE current law limits application fees to $50 | ADDITIONAL FEES such as processing fees, administrative fees, and others | TOTAL FEES PAID TO RENT A UNIT |
|---|---|---|---|---|
| **BLACK** | 3 | $50 | $0 to hundreds | $150+ |
| **LATINE** | 3 | $50 | $0 to hundreds | $150+ |
| **ASIAN AND PACIFIC ISLANDER** | 2 | $50 | $0 to hundreds | $100+ |
| **WHITE** | 2 | $50 | $0 to hundreds | $100+ |
| *ALL RENTERS* | *2* | *$50* | *$0 to hundreds* | *$100+* |

Sources: CORE's analysis based on current District law, Garcia, Manny. "Renters of Color Pay Higher Security Deposits, More Application Fees." *Zillow*, April 6, 2022.

---

[12] Garcia, Manny. "Renters: Results from the Zillow Consumer Housing Trends Report 2022." Zillow, July 27, 2022.

[13] Although the data cited throughout this REIA uses the term "Hispanic," CORE is using the term "Latine." Sources often use the term "Hispanic" because they rely on Census or other federal data that use the term "Hispanic" to collect data on people with ethnicities related to Spanish-speaking countries in Latin America and Spain. However, most "Hispanics" in the United States and the District are people with ethnicities from Latin America (also known as Latine)—and not Spain. The term "Hispanic" does not fully acknowledge the unique history of oppression and colonialism that Latines have faced in the United States and the District. To recognize this history, CORE uses the term "Latine" instead of "Hispanic." For more on this topic, see Lopez, Mark Hugo, Jens Manuel Krogstad, and Jeffrey S. Passel. "Who Is Hispanic?" *Pew Research Center*.

[14] Garcia, Manny. "Renters of Color Pay Higher Security Deposits, More Application Fees." *Zillow*, April 6, 2022.

[15] Garcia, Manny. "Renters of Color Pay Higher Security Deposits, More Application Fees." *Zillow*, April 6, 2022.

[16] Christensen, Peter, Ignacio Sarmiento-Barbieri, and Christopher Timmins. "Racial Discrimination and Housing Outcomes in the United States Rental Market." *National Bureau of Economic Research*, Working Paper Series, November 2021.

[17] "Public Hearing for B25-0074, Testimony from the DC Chief Tenant Advocate," May 18, 2023.

[18] "Public Hearing for B25-0074, Testimony from Marta Beresin," May 18, 2023.



## Renting in the District

Redlining[19] and racial covenants[20] on top of years of restrictions on wealth building opportunities[21] have led to dramatic inequities in homeownership rates across racial groups. Fifty percent of white households own their home, while 36% of Black households and 32% of Latine households do.[22] Therefore, Black, Latine, and other residents of color are more likely to rent than white residents. As a result, any changes to the law regarding renting is more likely to impact Black, Latine, and other residents of color than other residents.

Not only are households of color[23] more likely to rent, but when they rent, their rent is more likely to be unaffordable. One metric for affordability is *rent burden*, which measures what percentage of a household's income goes to rent. The higher the percentage, the higher the burden.[24]

Black and Latine households experience the highest rates of rent burden in the District, with more than one in two households spending over 30% of their income on rent[25] (Figure 3). Racial inequities in education,[26] hiring discrimination,[27] job segregation,[28] wealth inequities, and income inequities all contribute to the inequities in rent burden.[29]

**FIGURE 3**  **Black and other households of color have the highest rates of rent burden in the District.[30]**

| RACE AND ETHNICITY | SHARE OF HOUSEHOLDS SEVERELY RENT BURDENED These households pay more than 50% of their income on housing. | SHARE OF HOUSEHOLDS MODERATELY RENT BURDENED These households pay 30-50% of their income on housing. | TOTAL SHARE OF HOUSEHOLDS WITH RENT BURDEN |
|---|---|---|---|
| **BLACK** | 35% | 23% | 58% |
| **LATINE** | 26% | 23% | 49% |
| **ASIAN AND PACIFIC ISLANDER** | 23% | 27% | 50% |
| **MIXED/OTHER** | 21% | 24% | 45% |
| **WHITE** | 13% | 18% | 31% |

Note: Unfortunately, these tabulations did not make specific data available about Indigenous residents.[31]

Additionally, the median gross rent in the District continues to rise,[32] exacerbating the District's affordability crisis for Black residents and other residents of color.

---

[19] Mapping Segregation in D.C., Sarah Shoenfeld, DC Policy Center.
[20] Ibid.
[21] The Color of Wealth in the Nation's Capital, The Urban Institute, November 2016.
[22] Homeownership Rates by Race in the District of Columbia, National Equity Atlas, 2022.
[23] When CORE refers to "households of color," we are referring to Black, Indigenous, Latine, Asian American, Pacific Islander, and Native Hawaiian populations. We do so while acknowledging that each community of color has a unique history and experience of racism in the United States, and in particularly, in the District of Columbia.
[24] The affordability standard of "30% of income on rent" has been critiqued.
[25] Tabulations of US Census Bureau, 2016 American Community Survey 1-year Estimates using the Missouri Data Center MABLE/Geocorr14, Joint Center for Housing Studies of Harvard University.
[26] DC Racial Equity Profile, D.C. Policy Center and Council Office of Racial Equity.
[27] Are Emily and Greg More Employable than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination, Marianne Bertrand and Sendhil Mullainathan, National Bureau of Economic Research.
[28] DC Racial Equity Profile, D.C. Policy Center and Council Office of Racial Equity.
[29] Ibid.
[30] "Housing Burden: All Residents Should Have Access to Quality, Affordable Homes.," National Equity Atlas, 2020.
[31] Ibid.
[32] HAND, Housing Indicator Tool.



## Rent Increases, Evictions, and Race

Current law allows most landlords in the District to increase rent by any amount once the lease ends.[33] They are required to notify tenants 30 days in advance of the increase. As mentioned earlier, this bill increases the notice to 60 days.

Research on rent increases in the US shows that Latine, Black, and Asian and Pacific Islander renters are more likely to experience rent increases—and more likely to move because of them (Figure 4).

Rent hikes increase the likelihood of evictions—especially when a tenant has limited time to adjust to the rent increase.[35] Between 2014-2018, about 32,000 evictions were filed annually in DC. Some eviction filings are against the same tenant, meaning that "this process impact[ed] nearly 18,000 unique District households, or about 11 percent of renter households."[36] Most evictions are filed for unpaid rent (93%).[37]

**FIGURE 4** **Renters of color are more likely to move because of rent increases.[34]**

| RACE AND ETHNICITY | SHARE OF RENTERS WHO SAID A RENT INCREASE INFLUENCED THEIR DECISION TO MOVE IN THE PAST YEAR |
|---|---|
| LATINE | 63% |
| BLACK | 56% |
| ASIAN AND PACIFIC ISLANDER | 41% |
| WHITE | 38% |
| *ALL RENTERS* | *40%* |

Responses were captured between March and August 2021.

Data reveals how evictions and issues related to evictions are also economic and racial justice issues. A Georgetown University report both highlighted and underscored this point, noting that "the stark racialized geography of evictions in the District highlights a remarkable overlap between residential segregation and housing instability. Eviction filings are spatially concentrated in majority Black neighborhoods with the highest poverty rates in the city.[38]

In 2018, over 50% of evictions in DC were filed in Wards 7 and 8,[39] where over 90% of the residents are Black.[40] This is despite renters being evenly distributed across wards. Further, Wards 7 and 8 "account for only one-quarter of renter-occupied households in the District, [but] account for nearly 57 percent of eviction filings."[41]

The consequences of eviction are broad and deep. Facing an eviction can affect almost every aspect of a person's life—housing, physical and mental health, education, employment, and personal finances. And many of the consequences can occur even if the eviction doesn't—an eviction threat or filing alone can have consequences. For more racial equity analysis on eviction, see CORE's REIA for B24-0096 Eviction Record Sealing Authority And Fairness In Renting Amendment Act Of 2021.

---

[33] However, current law limits rent increases for rent-controlled apartments. The Rent Stabilized Housing Inflation Protection Emergency Amendment Act of 2023 limits new rent increases to 6% for rent-controlled units between July 1, 2023, and June 30, 2025.

[34] Garcia, Manny. "Renters of Color Pay Higher Security Deposits, More Application Fees." *Zillow*, April 6, 2022.

[35] Kasakove, Sophie. "As Rents Rise, So Do Pressures on People at Risk of Eviction." *The New York Times*, October 2021.

[36] McCabe, Brian J., and Eva Rosen. "Eviction in Washington, DC." Georgetown University, Fall 2020.

[37] Ibid.

[38] Ibid.

[39] Ibid.

[40] DC Health Matters. "DC Health Matters :: Demographics :: Ward :: Ward 7."

[41] McCabe, Brian J., and Eva Rosen. "Eviction in Washington, DC." Georgetown University, Fall 2020.



In summary, historic and ongoing racism has resulted in people of color being more likely to rent, more likely to pay more in application fees, more likely to be rent burdened when they find a unit to live in, and more likely to face an eviction filing.

## RACIAL EQUITY IMPACTS

**Limiting the total cost to apply for a rental unit will improve economic and housing outcomes for Black, Latine, and other residents of color searching for rental units.** Landlords charge renter applicants several fees when they apply for a unit, only one of which is capped by current law. As a result, limiting the number of fees allowed and capping the same fees decreases the amount that Black, Latine, and other residents of color must pay to find a place to live. In the US, a 2022 study found that nearly 70% of renters planned to move in three years.[42] If similar patterns apply to the District, then this bill would reduce the cost for many renters—and most renters are people of color.

Furthermore, high costs to apply for a rental unit can be a form of income discrimination. In DC, this means high application costs can also be a form of racial discrimination, as Black households are overrepresented in low-income brackets in DC, a result of systemic racism.[43] These application costs can preclude Black and other households from applying to units—further limiting their housing options and harming their housing outcomes.

---

*The following racial equity impact remains unchanged from the REIA on the introduced version and is applicable to the committee print for Bill 25-0074.*

**Increasing the notice period for rent increases will likely improve housing outcomes for Black, Indigenous, and other renters of color.** Black, Latine, and Asian and Pacific Islander renters are more likely to be harmed by rent increases. Although the bill does not address rising rent costs in the District, it does provide some relief in terms of extending the notice window. It is unclear if increasing the notice window ultimately helps renters stay in their homes, but it does provide them additional time to find another home.

Notably, the District is experiencing a housing crisis due to a lack of enough affordable housing options.[44] It is increasingly harming Black, Indigenous, and other residents of color.

## FURTHER CONSIDERATIONS

*The committee print addressed one further consideration from the REIA on the introduced version—and it was removed from this REIA as a result. The consideration below remains unchanged from the REIA on the introduced version and is applicable to the committee print for Bill 25-0074.*

**Further consideration is needed on background checks—the driving force behind application fees—due to their negative racial equity impacts.** While the bill reduces the total cost of applying to a rental unit, it does not address the practice of background checks—a main reason for rental application fees.

---

[42] Garcia, Manny. "Renters: Results from the Zillow Consumer Housing Trends Report 2022." Zillow, July 27, 2022.
[43] D.C. Policy Center and Council Office of Racial Equity. "DC Racial Equity Profile for Economic Outcomes."
[44] HAND, Housing Indicator Tool.



Research shows that background check software can be inaccurate and is more likely to deny Black and other applicants of color.[45, 46, 47]

Due to background checks' historical and ongoing impacts on Black and other residents of color, deeper consideration is needed on this fixture of the rental market.

## ASSESSMENT LIMITATIONS

Alongside the analysis provided above, the Council Office of Racial Equity encourages readers to keep the following limitations in mind:

**We generally do not provide policy solutions or alternatives to address our racial equity concerns.** While Council Period 25 Rules allow our office to make policy recommendations, we focus on our role as policy analysts—we are not elected policymakers or committee staff. In addition, and more importantly, racially equitable policymaking takes time. Because we only have ten business days to create this REIA on the committee print, we would need more time to ensure comprehensive research and thorough community engagement inform our recommendations.

**Assessing legislation's potential racial equity impacts is a rigorous, analytical, and organized undertaking—but it is also an exercise with constraints.** It is impossible for anyone to predict the future, implementation does not always match the intent of the law, critical data may be unavailable, and today's circumstances may change tomorrow. Our assessment is our most educated and critical hypothesis of the bill's racial equity impacts.

**Regardless of the Council Office of Racial Equity's final assessment, the legislation can still pass.** This assessment intends to inform the public, Councilmembers, and Council staff about the legislation through a racial equity lens. If a REIA is issued for a bill, committees must summarize and respond to the assessment in their committee report (a public document which accompanies the bill and explains the committee's reasoning, analysis of relevant issues, and hearing testimony, among other items contextualizing the legislation). Committee reports can be found via the [Legislative Information Management System (LIMS)](#) after a bill's mark up.

If a REIA identifies a negative impact on racial equity, the bill may be placed on the non-consent agenda at the next legislative meeting. However, a REIA is not binding.

**This assessment aims to be accurate and useful, but omissions may exist.** While we have reviewed both the introduced version and the committee print on the bill, we may not highlight *all* changes between the two documents. Our comparative analysis is for the purpose of this assessment.

In addition, given the density of racial equity issues, it is unlikely that we will raise *all* relevant racial equity issues present in a bill. An omission from our assessment should not: 1) be interpreted as a provision having no racial equity impact or 2) invalidate another party's racial equity concern.

---

[45] Boshart, Abby. "[How Tenant Screening Services Disproportionately Exclude Renters of Color from Housing](#)." *Housing Matters, an Urban Institute Initiative*, December 21, 2022.
[46] Brown, Lydia X. Z. "[Tenant Screening Algorithms Enable Racial and Disability Discrimination at Scale, and Contribute to Broader Patterns of Injustice](#)." *Center for Democracy and Technology*, July 7, 2021.
[47] See the [REIA for B24-0096 Eviction Record Sealing Authority And Fairness In Renting Amendment Act Of 2021](#) for more analysis on tenant screenings.



# ATTACHMENT 3

# Government of the District of Columbia
# Office of the Chief Financial Officer



**Glen Lee**
Chief Financial Officer

## MEMORANDUM

| | |
|---|---|
| **TO:** | **The Honorable Phil Mendelson**<br>**Chairman, Council of the District of Columbia** |
| **FROM:** | **Glen Lee**<br>**Chief Financial Officer** |
| **DATE:** | **June 21, 2023** |
| **SUBJECT:** | **Fiscal Impact Statement – Fairness in Renting Clarification Amendment Act of 2023** |
| **REFERENCE:** | **Bill 25-74, Draft Committee Print as provided to the Office of Revenue Analysis on June 16, 2023** |

## Conclusion

Funds are sufficient in the fiscal year 2023 budget and the fiscal year 2024 through fiscal year 2027 budget and financial plan to implement the bill.

## Background

The bill prohibits a landlord from charging a tenant any fee other than an application fee, prior to signing a lease. If a tenant is applying for other units owned or operated by the same housing provider within a thirty-day period, the bill requires the housing provider to charge only one application fee.

The bill prohibits housing providers from charging a tenant or prospective tenant a fee for a service the housing provider should already be performing to maintain a unit in a condition consistent with regulations and the standard of ordinary wear and tear. The bill limits the fee charged for a tenant to sublease, assign, or find a replacement tenant for a unit to the amount of the maximum allowable application fee, which is currently $50[1].

Lastly, the bill increases the minimum notice to tenants for rent increases from 30 to 60 days.

---

[1] D.C. Official Code § 42–3505.10(b)(1).

The Honorable Phil Mendelson
FIS: Bill 25-74, "Fairness in Renting Clarification Amendment Act of 2023," Draft Committee Print as provided to the Office of Revenue Analysis on June 16, 2023

**Financial Plan Impact**

Funds are sufficient in the fiscal year 2023 budget and the fiscal year 2024 through fiscal year 2027 budget and financial plan to implement the bill. The Department of Housing and Community Development (DHCD) indicates there may be costs associated with updating forms in the rent control database[2] being developed and transferred from the Office of the Tenant Advocate, which could delay that project. However, DHCD can absorb the costs necessary to implement the bill.

---

[2] D.C. Official Code § 42–3502.03c.

**ATTACHMENT 4**



**OFFICE OF THE GENERAL COUNSEL**
Council of the District of Columbia
1350 Pennsylvania Avenue NW, Suite 4
Washington, DC 20004
(202) 724-8026

## MEMORANDUM

**TO:**          **Councilmember Robert White**

**FROM:**     **Nicole L. Streeter, General Counsel** *NLS/DPG*

**DATE:**      **June 22, 2023**

**RE:**          **Legal sufficiency determination for Bill 25-074, the Fairness in Renting Clarification Amendment Act of 2023**

---

This measure is legally and technically sufficient for Council consideration.

This bill would limit the type and amount of fees that a housing provider may charge a prospective tenant when the prospective tenant applies for a unit, or when a tenant moves out of a unit. It also requires housing providers to give 60 days of notice before a rent increase becomes effective instead of 30 days of notice.

I am available if you have any questions.

# ATTACHMENT 5

1  **Comparative Committee Print**
2  **Committee on Housing**
3  **B25-0074**
4  **June 22, 2023**
5
6  D.C. Official Code § 42–3501.03. Definitions.

7  For the purposes of this chapter, the term:

8  \*\*\*

9  **(2A) "Application fee" means the total of any and all costs or fees that a prospective**

10  **tenant is required to pay to a housing provider at the time of application or at any time prior**

11  **to signing a lease as a prerequisite to evaluating or approving a prospective tenant's**

12  **application for rental housing, including but not limited to processing, reviewing, or**

13  **screening the prospective tenant's application.**

14  \*\*\*

15

16  D.C. Official Code § 42-3505.01(Perm). Evictions.

17  \*\*\*

18  (a-1)(1) A housing provider shall provide the tenant with notice of the housing provider's

19  intent to file a claim against a tenant to recover possession of a rental unit for the non-payment of

20  rent at least 30 days before filing the claim**, pursuant to D.C. Official Code § 16–1501**.

21  \*\*\*

22

23  D.C. Official Code § 42-3505.10. Tenant screening.

24  \*\*\*

25  (b)(1) A housing provider may require a prospective tenant to pay an application fee.

26  Such an application fee will be no more than $50.

1

27    (2) Beginning on January 1, 2024, the application fee specified in paragraph (1) of

28 this subsection may be adjusted annually by the housing provider, or his or her agent,

29 commensurate with an increase in the Consumer Price Index for All Urban Consumers published

30 by the United States Bureau of Labor Statistics.

31    **(3) A housing provider shall not charge a tenant any fee other than an**

32 **application fee, prior to signing a lease with the tenant.**

33    **(4) When a housing provider permits a tenant to find a replacement tenant,**

34 **assign the lease, or sublet, a housing provider may require the outgoing tenant to pay a**

35 **replacement fee, which shall not exceed the amount permitted as an application fee under**

36 **this subsection.**

37    **(b-1) When a prospective tenant applies for a unit that is owned or operated by a**

38 **housing provider, and within 30 calendar days the tenant applies to one or more other**

39 **units within the District that are owned or operated by the same housing provider, the**

40 **housing provider shall charge the prospective tenant only one application fee unless the**

41 **housing provider is required to perform more than one screening.**

42    **(b-2) A housing provider shall not charge a fee to a prospective tenant before move-**

43 **in, during a tenancy, or after move-out for services required of the housing provider to**

44 **maintain a unit in a condition consistent with the implied warranty of habitability and with**

45 **Titles 12 and 14 of the District of Columbia Municipal Regulations, or substantially similar**

46 **subsequent regulations; provided, that nothing in this subsection prohibits a housing**

47 **provider from withholding a tenant's security deposit to replace damaged items if the**

48 **tenant has caused damage to the unit beyond the standard of ordinary wear and tear as**

49 **defined in section 217(c)(3); provided further, that a housing provider shall not charge a**

50   **tenant a professional cleaning fee so long as the tenant returns the premises to the housing**

51   **provider in a condition within the standard of ordinary wear and tear as defined in section**

52   **217(c)(3).**

53   \*\*\*

54

55   D.C. Official Code § 42-3505.54. Notice of tenant's intent to vacate after the expiration

56   of the signed lease term, renewal or extension term.

57   \*\*\*

58   (b) A housing provider shall not place or cause to be placed in a residential lease or rental

59   agreement a requirement that the tenant provide more than a 30-day notice to the housing

60   provider of the tenant's intention to vacate the premises, unless the lease or agreement also

61   requires the housing provider to provide the tenant with a written notice of any rent increase that

62   is at least ~~15 days~~ **30 days** more than that time period.

63   \*\*\*

64

65   D.C. Official Code § 42-3509.04. Service.

66   \*\*\*

67   (b) No rent increases, whether under this chapter, the Rental Accommodations Act of

68   1975, the Rental Housing Act of 1977, the Rental Housing Act of 1980, or any administrative

69   decisions issued under these acts, shall be effective until the first day on which rent is normally

70   paid occurring more than ~~30 days after notice of the increase is given to the tenant~~ **60**

71   **calendar days after the notice of the increase is given to the tenant, provided that the**

72   **requirements of section 554(b) are met**.

3

**ATTACHMENT 6**

1   **Committee Print**
2   **Committee on Housing**
3   **B25-0074**
4   **June 22, 2023**
5
6
7
8                              A BILL
9
10                           _____
11
12
13         IN THE COUNCIL OF THE DISTRICT OF COLUMBIA
14
15                    _____
16
17   To amend the Rental Housing Act of 1985 to limit the amount of fees that a housing provider may
18         charge a prospective tenant associated with processing an application for rental housing, to
19         clarify the fees a housing provider may charge a tenant based on the condition of a unit,
20         and to increase the notice period for rent increases from 30 days to 60 days.
21
22         BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this

23   act may be cited as the "Fairness in Renting Clarification Amendment Act of 2023.".

24         Sec. 2. The Rental Housing Act of 1985, effective July 17, 1985 (D.C. Law 6-10; D.C.

25   Official Code § 42-3501.01 *et seq.),* is amended as follows:

26         (a) Section 103 (D.C. Official Code§ 42-3501.03) is amended by adding a new paragraph

27   (2A) to read as follows:

28         "(2A) "Application fee" means the total of any and all costs or fees that a

29   prospective tenant is required to pay to a housing provider at the time of application or at any time

30   prior to signing a lease as a prerequisite to evaluating or approving a prospective tenant's

31   application for rental housing, including but not limited to processing, reviewing, or screening the

32   prospective tenant's application."

33         (b) Section 501(a-1)(1) (D.C. Official Code § 42-3505.01(a-1)(1)) is amended by striking

34   the period and inserting the phrase ", pursuant to D.C. Official Code § 16–1501." in its place.

1

35    (c) Section 510 (D.C. Official Code § 42-3505.10) is amended as follows:

36    (1) Subsection (b) is amended by adding new paragraphs (3) and (4) as follows:

37    "(3) A housing provider shall not charge a prospective tenant any fee other than

38    an application fee, prior to signing a lease with the tenant."

39    "(4) When a housing provider permits a tenant to find a replacement tenant,

40    assign the lease, or sublet, a housing provider may require the outgoing tenant to pay a

41    replacement fee, which shall not exceed the amount permitted as an application fee under this

42    subsection."

43    (2) New subsections (b-1) and (b-2) are added to read as follows:

44    "(b-1) When a prospective tenant applies for a unit that is owned or operated by a

45    housing provider, and within 30 calendar days the tenant applies to one or more other units

46    within the District that are owned or operated by the same housing provider, the housing

47    provider shall charge the prospective tenant only one application fee unless the housing provider

48    is required to perform more than one screening."

49    "(b-2) A housing provider shall not charge a fee to a prospective tenant before move-in,

50    during a tenancy, or after move-out for services required of the housing provider to maintain a

51    unit in a condition consistent with the implied warranty of habitability and with Titles 12 and 14

52    of the District of Columbia Municipal Regulations, or substantially similar subsequent

53    regulations; provided, that nothing in this subsection prohibits a housing provider from

54    withholding a tenant's security deposit to replace damaged items if the tenant has caused damage

55    to the unit beyond the standard of ordinary wear and tear as defined in section 217(c)(3);

56    provided further, that a housing provider shall not charge a tenant a professional cleaning fee so

2

57  long as the tenant returns the premises to the housing provider in a condition within the standard

58  of ordinary wear and tear as defined in section 217(c)(3).".

59       (d) Section 554(b) (D.C. Official Code § 42-3505.54(b)) is amended by striking the

60  phrase "15 days" and inserting the phrase "30 days" in its place.

61       (e) Section 904(b) (D.C. Official Code § 42-3509.04(b)) is amended by striking the

62  phrase "30 days after the notice of the increase is given to the tenant" and inserting the phrase

63  "60 calendar days after the notice of the increase is given to the tenant, provided that the

64  requirements of section 554(b) are met" in its place.

65       Sec. 3. Fiscal impact statement.

66       The Council adopts the fiscal impact statement in the committee report as the fiscal

67  impact statement required by section, 602(c)(3) of the District of Columbia Home Rule Act,

68  approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

69       Sec. 4. Effective date.

70       This act shall take effect following approval by the Mayor (or in the event of veto by the

71  Mayor, action by the Council to override the veto), a 30-day period of congressional review as

72  provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December

73  24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of

74  Columbia Register.